**DEL A., et al., Plaintiffs–Appellees,**

v.

**Edwin EDWARDS, Individually and as Governor of the State of Louisiana, et al., Defendants–Appellants.**

**No. 88–3154.**

United States Court of Appeals, Fifth Circuit.

Sept. 28, 1988.

William A. Guste, Jr., Atty. Gen., Dept. of Justice, David A. Dalia, Asst. Atty. Gen., Emile W. Schneider, Mary Beck Widmann, Section Chief, Office of Gen. Counsel, Lemann, O'Hara, Miles & White, Arthur A. Lemann, III, New Orleans, La., for defendants-appellants.

Steven Scheckman, ACLU of La., Ann Maclaine, Mark A. Moreau, New Orleans Legal Assistance Corp., New Orleans, La., Christopher A. Hansen, ACLU, Christopher T. Dunn, Marcia Robinson Lowry, New York City, for plaintiffs-appellees.

Before THORNBERRY, WILLIAMS, and SMITH, Circuit Judges.

THORNBERRY, Circuit Judge:

This appeal questions the district court's conclusion that the individual defendants in this case are not entitled to qualified immunity from this 42 U.S.C. § 1983 suit. The complaint in this case alleges that the defendants violated various statutory and constitutional rights of the plaintiffs. Concluding that the asserted federal statutory rights were clearly and particularly established at the time of the alleged wrongs, we affirm without reaching the constitutional issues.

I.

In 1980, Congress amended portions of the Aid to Families with Dependent Children program in Title IV–A of the Social Security Act, 42 U.S.C. § 608. These amendments, known as the Adoptive Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620–628, 670–679, (the "Child Welfare Act") require that state foster care systems meet certain minimum conditions to qualify for federal funds. These conditions include, among others, requirements that the state develop a "case plan" for each child and a "case review system." *Id.* § 671(a)(16).

A case plan is defined in the Act as a written document containing a description of the type of home or institution into which the child is placed, the appropriateness of the placement, and how the state plans to carry out the placement of the child. *Id.* § 675(1). Additionally, a case plan must provide a method for assuring that the child receives proper care and that services are provided to the child, the parents, and foster parents to improve conditions in the parents' home to facilitate the return of the child to that home or to facilitate other permanent placement of the child. *Id.* The plan must also include a discussion of the appropriateness of the services provided in the plan. *Id.*

The Act defines the required case review system as a procedure for assuring that each child's case plan is designed to place the child in the "least restrictive (most family like) setting available and in close proximity to the parents' home." *Id.* § 675(5)(A). The system must have in place periodic reviews of the child's status, and the reviews must occur at least once every six months. *Id.* § 675(5)(B).

The Child Welfare Act also requires that after October 15, 1983, the state must make "reasonable efforts" to prevent the need for the removal of children from their

homes or to make it possible for children to return to their homes. *Id.* § 671(a)(15).

The plaintiffs in this case are 15 children who have been or are at risk of being taken involuntarily into custody by the Louisiana Department of Health and Human Resources (DHHR) as foster children.[1] In their complaint, the plaintiffs allege that the defendants—various Louisiana state officials sued in their individual and official capacities—violated various provisions of the Child Welfare Act as well as various provisions of the United States Constitution. The suit seeks damages for the named plaintiffs under 42 U.S.C. § 1983. The suit also seeks class-wide injunctive relief.

The individual defendants raised the defense of qualified immunity from damages and moved to dismiss the complaint or, in the alternative, for summary judgment. The motion stated that (1) the Child Welfare Act did not create substantive rights enforceable under Section 1983, and, if it did, the rights were not clearly established at the time of the alleged violations; and (2) the complaint failed to set forth a claim for the violation of recognizable constitutional rights, and, if it did, the rights were not clearly established at the time of the alleged violations. The district court denied the motion, holding that because the alleged illegal actions violated clearly established statutory and federal constitutional rights, qualified immunity was not available. The individual defendants filed this immediate appeal pursuant to *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (holding that a denial of a claim of qualified immunity is an appealable "final decision").

## II.

In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that government officials performing discretionary functions are immune from civil damages for conduct that does not violate clearly established constitutional or statutory rights. The Court also said that this immunity is one "from suit rather than a mere defense to liability...." *Mitchell*, 105 S.Ct. at 2816 (emphasis deleted). It is this characteristic—immunity from suit—that justifies immediate appeal of the denial of qualified immunity, for requiring officials to wait until after trial for review would effectively destroy this aspect of the immunity. *See Mitchell*, 105 S.Ct. at 2816; *Sorey v. Kellett*, 849 F.2d 960, 961 (5th Cir.1988).

Because qualified immunity is designed to protect discretionary functions of officials, it is not available when the official acts in such a way that it is clear that the actions will violate a person's rights. When the law is unclear, however, the official does require protection so that fear of suit will not cloud the decision-making process. Thus, the Supreme Court has held that the proper focus of our review on the question of qualified immunity should be whether the alleged conduct violated "legal principals that were 'clearly established'" at the time. *Anderson v. Creighton,* — U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The Supreme Court has provided us with a framework in which we are to determine whether rights are clearly established. *See id.* 105 S.Ct. at 3038–39. To illustrate the framework, the Court used as an example the rights supplied by the due process clause. The Court noted that "the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right." *Id.* at 3038. It concluded, however, that such a broad definition of "clearly established" would defeat the policy behind qualified immunity—shielding officials from suit for the exercise of discretion in circumstances in which "their actions could reasonably have been thought consistent with the [plaintiff's] rights...." *Id.*

---

1. The plaintiffs have made a motion to certify as a plaintiff class in this suit approximately 6000 children who are in the foster care of Louisiana or who are at risk of foster care placement. The district court has deferred its decision on class certification.

Thus, the concept of "clearly established" had to be defined narrowly to serve the goals of qualified immunity.

To achieve the proper scope for the immunity, the Court focused on the application of the right to the particular circumstances faced by the official at the time of the exercise of discretion. The Court said:

> The contours of the right must be sufficiently clear that a *reasonable official* would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Id.* at 3039 (emphasis added) (citations omitted). By particularizing qualified immunity to the facts of the case, the Court was able to protect officials in those many situations in which it is unreasonable to expect an official to know with complete certainty whether his actions will be unlawful. This method, however, also enabled the Court to remove the protection in cases in which the official should know that the proposed action would violate someone's rights.

In this case, then, to decide whether the defendants are entitled to qualified immunity, we must determine whether an objectively reasonable official would understand that the alleged improper actions were unlawful. If so, these defendants are not entitled to qualified immunity.

## III.

The officials first argue that the Child Welfare Act does not create substantive rights enforceable under Section 1983 because the Act was enacted pursuant to Congress' spending power. *See Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981) ("[T]he typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State."). *But see Wright v. City of Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 107 S.Ct. 766, 770–71, 773, 93 L.Ed.2d 781 (1987) (discussing *Pennhurst* and stating that the federal government's power to audit state housing authorities and to cut off federal funds is "insufficient to indicate a congressional intention to foreclose § 1983 remedies"); *L.J. ex rel. Darr v. Massinga,* 838 F.2d 118, 123 (4th Cir.1988) (holding that violations of the Child Welfare Act are privately enforceable under Section 1983), *petition for cert. filed,* 56 U.S.L.W. 3769 (U.S. May 2, 1988) (No. 87–1796). Next, the officials argue that if a private Section 1983 right of action exists, the right is limited to injunctive relief and that damages may not be recovered. *Compare Guardians Association v. Civil Service Commission,* 463 U.S. 582, 602 n. 23, 103 S.Ct. 3221, 3232 n. 23, 77 L.Ed.2d 866 (1983) (opinion of White, J., joined by Rehnquist, J.) ("Damages indeed are usually available in a § 1983 action, but such is not the case when the plaintiff alleges only a deprivation of rights secured by a Spending Clause statute."); *Scrivner v. Andrews,* 816 F.2d 261, 264 (6th Cir.1987) (damages are not available for violations of Child Welfare Act); *Harpole v. Arkansas Department of Human Services,* 820 F.2d 923, 928 (8th Cir.1987) (stating in dicta that no action for monetary damages exists for violations of the Act) *with Guardians Association,* 463 U.S. at 635–39, 103 S.Ct. at 3250–52 (Stevens, J., joined by Brennan and Blackmun JJ.) (strongly criticizing Justice White's statement about the availability of damages); *L.J. ex rel. Darr v. Massinga,* 838 F.2d 118, 123 (4th Cir.1988) (holding that "the Supreme Court did not distinguish between prospective equitable relief and an action for money damages in regard to the right to enforce privately"), *petition for cert. filed,* 56 U.S.L.W. 3769 (U.S. May 2, 1988) (No. 87–1796). We believe, however, that it would be premature for us to decide these abstruse questions on this interlocutory appeal because they do not directly affect the issue of qualified immunity.

As stated, qualified immunity exists to promote the integrity of the decision-making process for officials engaged in discre-

tionary acts. Without qualified immunity, an official exercising discretion will naturally hesitate to act when faced with the possibility that suit and liability will follow if a court later determines that the act infringed on some right. *See Harlow*, 102 S.Ct. at 2736. The immunity helps to overcome the costs associated with the official's uncertainty by allowing the official to make discretionary decisions without the fear of suit. However, when the course the official is to follow is clearly established by law in a particularized sense, so that the official should have no doubt about whether his actions are proper, this protection is unnecessary. Implicit in the definition of "clearly established" is the idea that the official is freed from doubt as to whether he may face suit. The official should know that following the clear dictates of the law will avoid suit. Thus, qualified immunity is unnecessary—and unjustified—when it should be clear to a reasonable official how the law applies in the particular circumstances.

As a consequence, the Supreme Court's tests for qualified immunity naturally focus on the conduct of the reasonable official in light of the asserted right and the particular circumstances. The ultimate test is whether "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 107 S.Ct. at 3039. The test is not whether a reasonable official would understand that he ultimately faces possible liability. Under the latter test, an official would be accorded decision making protection not only when the right is not clearly established, but also when the right is clearly established but the question of whether the individual has a private right of action for damages is unclear. Such broad protection is unnecessary to protect the integrity of the decision-making process; if the right is clearly established so that a reasonable official would understand how the law requires him to act, the official will know what to do to avoid possible liability.

We conclude, therefore, that the issues of whether the Child Welfare Act creates substantive rights enforceable under Section 1983 and whether if a private Section 1983 right of action exists, the right is limited to injunctive relief are not directly relevant to the question of qualified immunity. These issues implicate whether the officials will ultimately face liability for their actions, not whether the officials could understand that their actions violated the Child Welfare Act. Thus, we are not required to address these issues on this appeal.

While we might have the discretion to assume pendent appellate jurisdiction over these issues, *see San Filippo v. U.S. Trust Co.*, 737 F.2d 246, 255 (2d Cir.1984), we feel in this case that the more prudent course would be to follow the usual procedure of waiting until after a final decision in the district court. Depending on the disposition in the district court, it might become unnecessary to address these issues at all.

Thus, we now turn to the only directly relevant issue—whether the officials in this case should have understood that their alleged actions violated the Child Welfare Act.

## IV.

In determining whether these officials should have understood that their actions violated the Child Welfare Act, we must examine their actions as alleged in the complaint[2] in light of the specific provisions of the Act.

---

2. This appeal arises from the denial of a motion to dismiss the complaint or alternatively for summary judgment. Although normally this disposition would require us to examine affidavits and other summary judgment evidence, we need not do so in this case. It is clear from the parties' briefs on appeal and from the proceedings at trial that the parties are challenging only the legal sufficiency of the complaint. The parties both referred throughout this appeal to the allegations in the complaint. Moreover, the defendants stated in their "Supplemental Memorandum in Support of Motion to Dismiss and/or Motion for Summary Judgment" that "[t]he thrust of defendants' motion is that the children's allegations, accepting them as true, fail to state a claim" or alternatively should be "dismissed under the doctrine of qualified immunity." In their appellate briefs, appellants have failed to point to any specific factual insufficiency in the summary judgment evidence.

First, we examine the provisions of the Act governing the development of case plans. The Act requires that any state receiving federal funds develop a case plan for each child receiving foster care payments. 42 U.S.C. § 671(a)(16). The Act specifies the elements to be included in the case plans. *Id.* § 675(1). The plan must be developed within 60 days of the date the child enters care, 45 CFR § 1356.21(d)(2), and must be reviewed by the state agency at least every six months, 42 U.S.C. § 675(5)(B). The Act requires that the review be open to the child's parents. *Id.* § 675(6). The Act requires that a state court hold a hearing within 18 months of placement to determine the child's status. *Id.* § 675(5)(C). The appellees' complaint alleges that some of the plaintiffs had no case plans for years and went 9 months or longer without reviews.

Second, the complaint alleges that the defendants, when they developed case plans, violated the requirement that the plans assure "the permanent placement of the child." *Id.* § 675(1). They allege that many of the children have never had plans that assure placement. The Act says that states must implement a program designed to help children return to their families or be placed for adoption, *id.* § 627(a)(2)(C), and defines a case plan as including a plan for assuring the facilitation of the permanent placement of the child. *Id.* § 675(1). The complaint alleges, however, that the defendants delayed unnecessarily the implementation of many of the children's plans, vitiating the goal of permanent placement.

Third, the complaint alleges that the defendants have violated protections, other than the case plans and case reviews, required by the Act. The Act requires that the case plan be designed to place the child in the "least restrictive (most family like) setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child." *Id.* § 675(5)(A); *see also* 45 CFR § 1356.21(d)(3). Six of the children were allegedly placed in institutions, which the plaintiffs allege are more restrictive and less family-like than necessary. Indeed, the complaint alleges that in one case the defendants failed to follow an order of the juvenile court specifically requiring that one of the children be placed in a setting less restrictive than that in which he was kept. The Act also requires that the plan assure that the child receives "proper care," 42 U.S.C. § 675(1), and that the state establish, maintain, and reasonably assure foster homes and child care institutions that "are reasonably in accord with recommended standards of national organizations concerned with standards for such institutions or homes, including standards related to admission policies, safety, sanitation, and protection of civil rights ... ," *id.* § 671(a)(10). The complaint alleges many instances of improper care and supervision, including inadequate screening and supervision of foster homes and sexual abuse by a foster parent.

Fourth, the complaint alleges that the defendants violated the provision requiring that after October 1, 1983, reasonable efforts be made prior to the placement of a child in foster care to prevent or eliminate the need for removal of the child from his home and to make it possible for the return of a child to his home. The complaint alleges that several of the children were placed after this effective date, but that no reasonable efforts were made to return them home even though some of the parents were able or could have been able to take them home with only minimal help.

Finally, the complaint alleges that although the Act requires the state to conduct an inventory of all foster children and establish and operate an information system to track certain information about the children, *id.* § 627(a)(1), 627(a)(2)(A), no such system exists.

Overall, the complaint alleges wholesale neglect by these officials in following the dictates of the Child Welfare Act. Many of the allegedly neglected requirements are obviously clearly established in a particularized sense. Any reasonable person would know, for example, when to develop

Therefore, we will confine our review to the sufficiency of the allegations in the complaint.

a plan, when to review the plan, when to hold a hearing, what elements to include in the case plans, and that an information system must be developed. Moreover, as the Fourth Circuit found in a very recent case, the requirements calling for case plans, case review systems, proper care (as specifically defined in the Act) and the maintenance of standards reasonably in accord with those of national organizations "spell out a standard of conduct, and as a corollary rights in the plaintiffs" sufficient to defeat qualified immunity. *See L.J. ex rel. Darr v. Massinga*, 838 F.2d 118, 123 (4th Cir.1988), *petition for cert. filed*, 56 U.S.L.W. 3769 (U.S. May 2, 1988) (No. 87–1796). The complaint basically alleges that in many cases no attempt was made to follow these provisions of the Child Welfare Act. No reasonable official could have believed that such inaction was lawful. For this reason, we find that these defendants are not entitled to qualified immunity from this complaint.

### V.

The complaint also says that the defendants violated three allegedly clearly established constitutional rights: (1) when a state takes a person into custody, the due process clause requires that the state not injure that person; (2) when the state deprives a person of liberty for noncriminal reasons, the state must place that person in the least restrictive, appropriate setting; and (3) when the state deprives a person of statutorily created property or liberty interests, it must do so in accordance with due process of law.

At this time, however, we need not decide whether these general rights are clearly established in the particular circumstances alleged. *See Massinga*, 838 F.2d at 122. Federal courts are to avoid addressing constitutional questions when possible. *See Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 56 S.Ct. 466, 483, 88 L.Ed. 688 (1936) (Brandeis, J., concurring). Allowing interlocutory appeals on qualified immunity effectuates the policy of allowing officials to avoid litigation when they have unwittingly violated the law. In this case, however, we have already determined that further litigation is necessary on the statutory claims. Deciding the constitutional questions at this point, therefore, would not relieve the officials of the litigation burden. Further proceedings in the district court could avoid the need for a decision on these issues, and we therefore decline to address them now.

### VI.

For the reasons expressed in this opinion, we hold that the district court properly denied the motion to dismiss or for summary judgment on the issue of qualified immunity. Therefore, the order of the district court is AFFIRMED.

JERRY E. SMITH, Circuit Judge, dissenting:

Counsel for the plaintiffs has acknowledged that in accordance with plaintiffs' view of this case, the governor and other high state officials can be made to stand trial and pay personal money damages if certain regulatory details—such as a reporting deadline—are not met in the implementation of the Child Welfare Act. The majority has concluded that if, for example, a report is not filed as often as the Act requires, the defendants have violated a clearly-established right cognizable under section 1983 and that, hence, this qualified-immunity appeal must fail. Today's holding leads, inadvertently, to an untoward result that undermines the very federal aid program at issue—most assuredly a consequence which Congress could not have intended.

### I.

The majority has acknowledged the possibility that we can exercise discretion, in a qualified-immunity appeal, to examine the sufficiency of the claims. Although the majority's decision to forego that inquiry is not in the abstract unreasonable, I instead would, in this case, analyze the claims for legal sufficiency and would conclude that the plaintiffs have not stated a federal cause of action.

Both the Second and Eighth Circuits consider collateral issues where a public official appeals from a lower court judgment denying summary judgment. *See San Filippo v. United States Trust Co.*, 737 F.2d 246, 255 (2d Cir.1984), *cert. denied*, 470 U.S. 1035, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985); *Drake v. Scott*, 812 F.2d 395, 397–99 (8th Cir.), *modified on other grounds*, 823 F.2d 239 (8th Cir.), *cert. denied*, — U.S. ——, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987). These circuits have considered the legal sufficiency of section 1983 claims where the defendants have taken qualified-immunity interlocutory appeals. They have determined that it will often be better and more economical for the appeals court to determine issues closely related to the issue on appeal, rather than forcing the district court to revisit old issues reformulated.[1] Since the gravaman of a qualified-immunity interlocutory appeal is whether the rights alleged have been clearly established, both circuits have used such appeals to determine whether the alleged rights existed at all. *San Filippo*, 737 F.2d at 255; *Drake*, 812 F.2d at 399.

I would apply such a rule to determine the legal sufficiency of the claims here. Qualified immunity exists to protect public officials, in appropriate circumstances, from the rigors of vexatious litigation; interlocutory appeals are allowed from orders denying qualified immunity because we wish to protect officials' right to insulate their personal resources from costly, unnecessary trials. However, the majority overlooks the policies undergirding the doctrine of qualified immunity when it decides not to examine the merits of plaintiffs' complaint.

Here, the majority holds that the Adoption Assistance Act unambiguously defines specific rights which state officials may not violate. Reduced to its essentials, the plaintiffs' claimed cause of action leads to bizarre results, at least in some of its applications. For example, the Act requires that the state must adopt a case plan for each affected child within 60 days after the child enters care, and must review the plan every 6 months. The plaintiffs, through their attorneys, have acknowledged that under their theory of the case, if state human resources officials wait, say, 75 days before adopting a plan as to a child, or review the child's plan only every 7 months, the Governor of the State of Louisiana is personally (i.e., from his own pocket) liable to pay damages to that child under section 1983, as are the other individual defendants.

The plaintiffs, however, will not prevail in this lawsuit *unless* they can also prove that the defendants were responsible for violating at least some of these rights, *and* that plaintiffs have a right to collect money damages from the defendants for such a violation. The majority would require these high-level state officials to engage in the arduous task of defending against the factual allegations of the thousands of class plaintiffs and eighteen individual plaintiffs.

The plaintiffs do not allege that the officials specifically decided to deprive any foster child of his or her rights, but only that the officials consciously managed Louisiana's foster care system in an inept manner, and thus *indirectly* violated the children's rights. But the majority today holds that the officials must undertake this burdensome defense and answer these charges at trial before we shall decide whether the children have ever had *any* right to sue the officials for damages in the first place.

The policies underlining qualified immunity require courts to determine, as early as possible, whether there is any merit to the plaintiffs' claims, so as to avoid exposing state officials to vexatious litigation based upon decisions those officials have made in good faith pursuant to their public duties. Since I can find no reason to be-

---

1. The Second Circuit has developed a generalized rule for these circumstances. Under its doctrine of pendent appellate jurisdiction, the court first determines whether it has jurisdiction over an appeal of any of the issues raised.

Once the appellate court has recognized jurisdiction over the case, it may exercise its discretion to consider otherwise nonappealable issues that sufficiently overlap the appealable issues. *San Filippo*, 737 F.2d at 255 (citing cases).

lieve that the plaintiffs are entitled to damages, I would hold that this court has discretionary power to consider pendent claims on interlocutory appeal, and would exercise that discretion to dismiss the plaintiffs' Adoption Assistance Act claims. I now turn to the deficiencies which I perceive in those claims.

## II.

The majority's opinion decides only one issue: whether the Adoption Assistance Act clearly establishes rights upon which the foster children may base the instant suit. The majority does not consider whether these children have the right to sue high-level state officials for damages. As I read the Supreme Court's pronouncements, however, the very arguments which the Court has used to justify the right of individuals to sue under federal funding statutes for injunctive relief preclude the right of individuals to sue state officials for damages.

In *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), the Court reviewed its prior spending-clause jurisprudence as follows:

> [O]ur cases have long recognized that Congress may fix the terms on which it shall disburse federal money to the States.... [H]owever, legislation enacted pursuant to the spending power is *much in the nature of a contract;* in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' ... We must carefully inquire, then, whether Congress in § 6010 imposed an obligation on the States to spend state money to fund certain rights as a condition to receiving federal moneys under the Act....

*Id.* at 17–18, 101 S.Ct. at 1540 (emphasis added). Thus, the federal government may agree to provide the state with funding when the state agrees to use the federal assistance to benefit third parties.

In *Wright v. Roanoke Redev. & Hous. Auth.*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), the court revisited *Pennhurst* to determine whether public housing laws and regulations imposed enforceable obligations upon the governmental entities that participated in a federal public housing assistance program. The plaintiffs were tenants suing a local public housing authority to enforce rent regulations enacted by Congress. The local housing authority contended that the regulations, contained in a federal spending statute, were not enforceable obligations against it. The Court disagreed:

> In our view, the benefits Congress intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights under *Pennhurst* and § 1983....

*Id.* at 775. Thus, like third-party beneficiaries to a contract, the beneficiaries of federal funding statutes may sue for entitlements the states have promised to deliver.

Although the Court's analogy to contract law in *Pennhurst* supports the children's right to sue the state for violating the Adoption Assistance Act, it does not support the children's action against the governor and his aides individually for damages. Under the *Pennhurst* contract analogy, the children are third-party beneficiaries to an agreement between the federal government and Louisiana to provide specific services to the children. Under the principles of contract law, the children have the right, as third-party beneficiaries, to sue *the state* for the benefits the state has undertaken to provide. Like an insurance company that contracts with a manufacturer to provide health insurance to all the manufacturer's employees, for example, the state is liable to the children to provide the contracted services.

However, just as the insurance company's liability does not extend in damages to its chief executive officer or other company officials, the liability of the state should not extend to its governor or his aides. It simply makes no sense to require the highest officials of the state to assume state

liabilities that may have been generated by low-level civil servants or mid-level administrators.

Several Supreme Court opinions support the proposition that state officials do not owe harmed individuals, from their own pockets, where the state violates a federal spending statute. In *Rosado v. Wyman,* 397 U.S. 397, 420, 90 S.Ct. 1207, 1222, 25 L.Ed.2d 442 (1970), the Court held that welfare claimants were "entitled to declaratory relief and an appropriate injunction by the District Court against the payment of federal monies ... should the State not develop a conforming plan with a reasonable period of time." The *Rosado* court concluded that a federal court could adjudicate disputes under a federal spending statute because even if the state lost, it would have to choose merely between assuming the additional costs of complying with the federal statute and discontinuing the use of federal funds. *Id.* at 420–21, 90 S.Ct. at 1222.

In *Pennhurst,* the Supreme Court reiterated the *Rosado* analysis, and added a few other observations about relief available in such cases. "In no case," the Court opined in dicta, "have we required a State to provide money to plaintiffs...." *Pennhurst,* 451 U.S. at 29, 101 S.Ct. at 1546. The Court also wrote,

> In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State.

*Id.* at 28, 101 S.Ct. at 1545.[2] Subsequent to *Pennhurst,* Justice White, announcing the judgment of the Court, explained why damages are not available, even against the offending state, to plaintiffs suing upon the requirements of a spending clause statute:

> This is because the receipt of federal funds under typical Spending Clause legislation is a consensual matter: the State or other grantee weighs the benefits and burdens before accepting the funds and agreeing to comply with the conditions attached to their receipt. Typically, before funds are advanced, the appropriate federal official will determine whether the grantee's plan, proposal, or program will satisfy the conditions of the grant or other extension of federal funds, and the grantee will have in mind what its obligations will be. When in a later private suit brought by those for whose benefit the federal money was intended to be used it is determined, contrary to the State's position, that the conditions attached to the funds are not being complied with, it may be that the recipient would rather terminate its receipt of federal money than assume the unanticipated burdens.

*Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 596, 103 S.Ct. 3221, 3229, 77 L.Ed.2d 866 (1983).

In these cases, various Justices have suggested that states deserve the right to refuse federal funding before courts may impose judicial sanctions. This rule implies that the federal judiciary should defer to the state government's right to withdraw from its funding agreement with the federal government. Presumably, the Supreme Court, recognizing that its jurisdiction over the case rests solely upon the state's consent, chooses only prospective remedies (i.e., injunctions rather than money damages) as a form of federal-state comity.[3]

---

**2.** I recognize that under *Wright,* private actions to enforce individual rights under funding statutes may become more prevalent. Nonetheless, I quote this language from *Pennhurst* to emphasize that spending clause statutes primarily calibrate the relationships between the federal government and the entities with which it does business. Such statutes affect individual rights only to the extent of the conditions the statutes impose upon the relationship between the federal government and the funded entity.

**3.** *See Guardians,* 463 U.S. at 603–04, 103 S.Ct. at 3233 (White, J.) (analogizing, for the purposes of determining available relief, spending clause cases to eleventh amendment immunity cases). *Cf. Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) (state's consent to abide by spending statute obligations is not consent enough to waive eleventh amendment sovereign immunity). *See also* Fletcher, *A Historical Interpretation of the Eleventh Amendment: A Narrow Construction*

Moreover, we must also consider what Louisiana has agreed to do in exchange for federal funds: nothing more than to exercise its own legislative powers to establish legal rules that only it can enact. The Constitution carefully segregates the powers of the federal and state governments: "[N]one of the Framers questioned that the Constitution created a federal system with some authority expressly granted the Federal Government and the remainder retained by the several States." *Atascadero*, 473 U.S. at 238–39 n. 2, 105 S.Ct. at 3145 n. 2. *See, e.g.*, The Federalist Nos. 39, 45. Consequently, many governmental functions, such as regulation of family life, are beyond the realm of federal regulation.

What is beyond the ability of the federal government to regulate, however, is not necessarily beyond its power to influence. Congress may condition federal grants upon an agreement that the recipient states must enact legislation that is solely within the powers of the states to promulgate. *South Dakota v. Dole*, —— U.S. ——, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). Congress does not thus invade powers reserved to the states, since the states may choose the simple expedient of refusing the federal funds. *Id.*, 107 S.Ct. at 2798. Congress enters the field not as a regulator exceeding its constitutional powers, but as a provider of funds fixing the terms upon which others may partake of its largess. *Id.*

It should go without saying, then, that the states retain sole sovereign power to govern individual relations where the Constitution either expressly delegates a power to the states,[4] or implicitly withholds regulatory authority from the federal government.[5] Since the states retain sole authority to regulate in these areas, we should confine remedies to those that enforce the contractual agreement between the participating state and the federal government; otherwise federal spending powers will tend to swallow state sovereign powers.

The Sixth Circuit faced this problem squarely in *Lesher v. Lavrich*, 784 F.2d 193 (6th Cir.1986). There, a mother, joined by her second husband, sought to regain her children from the Ohio foster-care system. She argued in part that Ohio neglect laws, which Ohio had applied to remove her children from her custody, were invalid because those laws did not comply with the federal Adoption Assistance Act. She sought damages from state officials and an injunction undoing the judgment to remove her children from her custody. The district court declined, and the court of appeals affirmed, holding that the plaintiff was not entitled to the relief she had requested. The court reasoned that the Adoption Assistance Act did not, and could not, preempt Ohio regulation of its foster-care system:

> An otherwise valid finding of neglect or dependency could not be rendered invalid —at least not under this statute—merely by the failure of the State to undertake an obligation to offer preventive services. Such a result would permit even clearly abusive parents to escape the State's child protection apparatus, and could not have been any part of the Congressional intent underlying the rights that may be established by the Act.

784 F.2d at 198. Accordingly, since the Adoption Assistance Act does not mean that Ohio courts no longer have the power to enforce Ohio child-care laws, Ohio public officials were not liable to this plaintiff for damages under that act. *Id.*

---

*of an Affirmative Grant of Jurisdiction Rather than a Prohibition Against Jurisdiction*, 35 Stan. L.Rev. 1033, 1124–27 (1983) (suggesting that the Supreme Court, cognizant of the limits of federal power over the states, is reluctant, in a case based upon the spending clause, to hold that a state has waived eleventh amendment immunity).

4. *South Dakota v. Dole*, 107 S.Ct. at 2793 (the states retain the exclusive right, under the twenty-first amendment, to determine whether a teenager may buy alcohol even where the federal government requires states receiving federal highway funds to establish twenty-one as the minimum drinking age).

5. *E.g., Oklahoma v. Civil Serv. Comm'n*, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947) (allowing Congress to require federally-funded state governmental entities to adhere to the Hatch Act despite Congress' inability to regulate local politics).

In *Scrivner v. Andrews*, 816 F.2d 261 (6th Cir.1987), the Sixth Circuit held that damages are never available against state officials in an action to enforce the Adoption Assistance Act. There, three social workers employed by the Kentucky Cabinet of Human Services arranged a visitation schedule that allowed a natural mother to see her child for only one hour on alternate weekends. A state hearings officer overruled the social workers, and decreed that the mother could see her child twice a week for three hours at a time. The mother and child, seeking damages, challenged the order of the hearing officer on the ground that it denied them "meaningful visitation" rights secured by the Adoption Assistance Act.

The appeals court ruled against the mother and her child. As an alternative holding, the court held that damages were not available under the Adoption Assistance Act. Relying upon *Lesher, Scrivner* quoted Justice White's opinion in *Guardians* to the effect that damages are never available to plaintiffs who allege only that the state has violated a spending clause statute. *Scrivner*, 816 F.2d at 264. The *Lesher/Scrivner* rule may be generalized as follows: Where the federal government relies upon powers solely within the province of the states as a means of enacting federal policies, it cannot create federal rights entitling individual plaintiffs to damages or retroactive injunctions.

Here, the plaintiffs have advanced the theory that the Adoption Assistance Act creates a federal right permitting them to sue the governor of Louisiana. If they are correct, it seems that the Constitution would never prevent the federal government from enacting laws allowing the citizens of a state to sue that state's officials. Congress could regulate even areas the Constitution explicitly forbids it to regulate, provided states participating in a federal grant program agreed to enact the specific regulations themselves. Whether the states ever actually kept the bargain would be irrelevant—plaintiffs could sue state officials in their *individual* capacities as a matter of *federal* right. Only the state's consent would be relevant to whether plaintiffs could sue on this new federal right.

To the contrary, however, I conclude that the consent of the state alone may not subject any citizen, including its governor, to suit in federal court for alleged violations of laws which Congress itself could not have enacted. I would hold that the Adoption Assistance Act creates individual rights that can be enforced only prospectively and only against the participating states themselves, or against state officials only in their official capacities.

### III.

Thus, I conclude that all of the plaintiffs' claims should be dismissed. The majority, though ably analyzing the single legal question it addresses, unfortunately does not speak to the most basic issues at the heart of this litigation. It does not consider whether the plaintiffs' constitutional claims are clearly established—and they are not—nor does it address whether the plaintiffs have any right at all to force the officials to pay damages out of their own pockets. Thus, the majority allows a single dubious claim to frustrate the defendants' right, under the doctrine of qualified immunity, to avoid having to face a jury and answer, in damages, novel claims of unestablished constitutional "rights."

Ironically, this result promises to frustrate the policies which the suit itself was instituted to enforce. It creates a powerful disincentive for state officials to participate in such programs because of the possibility that they will incur sizeable, personal financial liability if a few deadlines are not met or some intricate regulatory detail is not followed to the letter. The result is that the very persons whom the federal statute is designed to benefit—the qualifying children of Louisiana—are the big losers.

At this point, the analysis returns to its starting point. We have jurisdiction here because of the need, recognized in *Mitchell v. Forsyth* and *Harlow v. Fitzgerald*, to protect public officials from the chilling effect which potential litigation has upon

the exercise of policymaking discretion in the administration of programs such as those carried out under the Child Welfare Act. The holding today sends those very officials back into the courtroom to face probable trial, and possible personal liability, despite the absence of any violation of clearly-established rights.

With the best of intentions, the majority has placed an intolerable burden upon public officials who, wishing to take advantage of federal assistance, are faced with a more-than-imaginary conflict of interest: They must decide between substantial financial assistance for a deserving and disadvantaged class of their own citizens, on the one hand, and reasonably insuring themselves against personal financial disaster, on the other. Congress could not have intended so unpalatable and counter-productive a scheme, and our system of federalism would appear to forbid it. I respectfully dissent.