**Samuel WINSTON, Jr., a minor, by his parents, Maryann and Samuel WINSTON, Sr., and Maryann Winston and Samuel Winston, Sr.**

v.

**CHILDREN AND YOUTH SERVICES OF DELAWARE COUNTY, H. Scott Campbell, Sandra Cornelius, County of Delaware, and John F. White, Jr.**

Civ. A. No. 89–6162.

United States District Court,
E.D. Pennsylvania.

Sept. 24, 1990.

John J. Auritt, Patricia A. Malley, Media, Pa., for plaintiffs.

David M. Donaldson, Sr. Deputy Atty. Gen., Philadelphia, Pa., for John F. White, Jr.

Michael P. Dignazio, Asst. County Sol., Media, Pa., for Children and Youth Services of Delaware County, H. Scott Campbell, Sandra Cornelius and County of Delaware.

## MEMORANDUM

CAHN, District Judge.

The plaintiffs in this civil rights action, a married couple and their minor child, seek declaratory and injunctive relief against

Children and Youth Services of Delaware County ("CYS"), the County of Delaware ("County"), several county officials, and the Secretary of the Department of Public Welfare for the Commonwealth of Pennsylvania ("DPW" or "Department"). The plaintiffs challenge CYS's parental visitation policies for children who have been adjudged dependents and temporarily placed in foster care; they also challenge the DPW regulation pertaining to visitation. The plaintiffs seek declaratory and injunctive relief under the Adoption Assistance and Child Welfare Act, 42 U.S.C. §§ 620–28, 670–79, 42 U.S.C. § 1983, and the First, Ninth, and Fourteenth Amendments to the Constitution. Complaint, ¶ 2.[1] They ask that four hours per week be established as the minimum visitation period between parents and children in foster care when the goal is reunification.

## I. FACTS

The case was presented to this court during hearings on April 27, 1990, June 25, 1990 and September 4, 1990, based on a largely stipulated record. The relevant facts are as follows.

CYS is a county children and youth social service agency which provides emergency and planned temporary child placement services, adoption services, placement prevention and family reunification services, and other family services. *See* 55 Pa.Code §§ 3130.34, .35 (1985). When a child has been found to be a dependent by the court, 42 Pa.Cons.Stat.Ann. § 6341(c) (Purdon

1982),[2] the court may transfer temporary custody of the child to the county agency. 42 Pa. Cons.Stat.Ann. § 6351(a)(2)(ii) (Purdon Supp.1990). The county agencies are administered in accordance with regulations promulgated by the DPW. 55 Pa. Code § 3130.1 *et seq.* (1985).[3] The agencies are bound to follow the regulations published by the Department. *See In re Lowry*, 506 Pa. 121, 127, 484 A.2d 383, 387 (1984); *Janet D. v. Carros*, 240 Pa.Super. 291, 317, 362 A.2d 1060, 1073 (1976).

This lawsuit raises a challenge both to CYS's visitation policy and to the DPW regulation pertaining to visitation. Complaint, ¶¶ 24, 25.[4] The regulation in question mandates that the county agency provide parental visits for children who have been temporarily placed in agency custody. The regulation provides:

The county agency shall provide opportunity for visits between the child and parents as frequently as possible but no less frequently than every 2 weeks at a time and place convenient to the parties and in a location that will permit natural interaction, unless visiting is:

(1) Clearly not in keeping with the placement goal—for example, in adoption or independent living.

(2) Freely refused in writing by the parents.

(3) Not in the child's best interest and is limited or prohibited by court order.

55 Pa.Code § 3130.68(a) (1985).[5] As the plaintiffs emphasize, the regulation makes

---

**1.** The plaintiff also asks the court to declare that the visitation policy "violates the spirit" of DPW regulation, 55 Pa.Code § 3130.68 (1985) and the Pennsylvania Juvenile Act, 42 Pa.Cons.Stat.Ann. § 6301 *et seq.* (Purdon 1982).

**2.** A dependent child is a child who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa.Cons.Stat. Ann. § 6302 (Purdon 1982).

**3.** The regulations are published pursuant to rulemaking authority delegated to the Department by the legislature. 62 Pa.Cons.Stat.Ann. § 703 (Purdon 1968).

**4.** Alternatively, the plaintiffs ask the court to find that the regulation is valid but that CYS's policy violates it.

**5.** Before this regulation was enacted, the DPW published draft regulations in July, 1979 which required visits of one-half day every week. Because rural counties objected, based on travel time, and because local county agencies wanted more discretion, the DPW changed the regulations to require one visit every two weeks. However, the Department strongly recommended that the agencies arrange for more frequent visits for all children, even when long distances posed serious problems. Department of Public Welfare of the Commonwealth of Pennsylvania, Social Services Memorandum # 16–80 at 1 (May 30, 1980).

no mention of the required length of each visit.

Often, when children are first taken into CYS's custody, parents may visit their children only under the supervision of agency staff and only in the agency offices. According to a stipulation entered into by the parties, approximately 35–40% of the children in placement are at some time subject to a plan of supervised visitation. Typically, supervised visitation occurs at the beginning of the placement. Stipulation As To Agency Policy, ¶ 1. When the visits are to take place in the agency office, they are initially scheduled once every two weeks for one hour. *Id.*, ¶ 2. At the discretion of the social worker, the biweekly visits may be extended to two hours. *Id.*, ¶ 3.

On June 21, 1989, CYS removed three-year-old Samuel Winston, Jr. from the custody of his parents, Maryann Winston and Samuel Winston, Sr., and placed him in a foster home. Mrs. Winston was intoxicated, and she was being taken to a hospital crisis unit. Mr. Winston had just been imprisoned at Delaware County Prison in connection with a minor drug possession charge. At the time the Winstons resided at the Wesley House, a homeless shelter in Chester, Pennsylvania. Stipulation of Facts, ¶ 1.

Two days later, a preliminary hearing regarding Samuel, Jr.'s custody was held before David McNulty, a Master of the Court of Common Pleas of Delaware County, Pennsylvania.[6] Mrs. Winston was still hospitalized, and Mr. Winston was incarcerated. At this time, Judge McNulty ordered that CYS continue to exercise protective custody over Samuel, Jr. *Id.*, ¶ 2.

On July 11, 1989 an adjudicatory hearing was held before Master McNulty. On July 25, 1989, pursuant to the report of Master McNulty, Judge Robert A. Wright issued an order decreeing that Samuel, Jr. was a dependent, "by reason of being without proper parental care and control," and awarding legal and physical custody to CYS. Judge Wright ordered Mr. and Mrs.

Winston to cooperate with CYS in planning for the care of Samuel, Jr., and to visit the child "regularly as arranged by Children and Youth Services." Plaintiffs' Trial Brief, Exhibit A.

After the July 11, 1989 hearing, CYS advised Mr. and Mrs. Winston that they would be able to visit with their son for one hour every two weeks at CYS's Chester office for as long as supervised visitation was necessary. Stipulation of Facts, ¶ 5. For the next several months, these visits occurred largely as scheduled. The visits lasted from one to one and one-half hours. *Id.*, ¶¶ 6, 13, 14.

Beginning on July 20, 1989, and on numerous occasions thereafter, Mr. and Mrs. Winston requested permission to see their son more frequently. These requests were denied. *Id.*, ¶ 7. Meanwhile, the plaintiffs secured counsel. On July 20, 1989 the plaintiff's attorney filed a motion for rehearing on the matter of dependency. The case was listed for hearing on September 26, 1989. *Id.*, ¶ 8.

By an order dated October 3, 1989, the review hearing was continued to October 17. It was ordered that, until the next hearing, CYS would increase Mr. Winston's visits with his son to a minimum of two hours per week. Mrs. Winston's visiting privileges were not increased, because she was suffering from psychiatric and substance abuse problems. It was also ordered that her visits be conducted separately from her husband's. *Id.*, ¶ 18. Mrs. Winston was hospitalized from October 9, 1989 to January 23, 1990. During the period between October 9 and December 19, caseworkers brought Samuel, Jr. to the hospital to visit with his mother on four occasions. *Id.*, ¶¶ 19, 21, 22, 25. On December 19, 1989 physical custody of Samuel Winston, Jr. was returned to his father, Samuel Winston, Sr. On March 27, 1990 legal and physical custody was returned to both of the Winstons, "under the protective supervision of Children and Youth Services." *Id.*, ¶ 26.

---

**6.** Such a hearing must be held within 72 hours after the parents lose custody of their child. 42 Pa.Cons.Stat.Ann. § 6332 (Purdon Supp.1990).

## II. DISCUSSION

### A. ADOPTION ASSISTANCE AND CHILD WELFARE ACT

██ The plaintiffs argue that the visitation policy and regulation have deprived them of rights secured by the Adoption Assistance and Child Welfare Act of 1980 ("AAA"), 42 U.S.C. §§ 620–628, 670–679. The AAA expanded the requirements for states participating in the federal foster care program. According to the legislative history, the AAA was designed "to lessen the emphasis on foster care placement and to encourage greater efforts to find permanent homes for children either by making it possible for them to return to their own families or by placing them in adoptive homes." S.Rep. No. 336, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.Code Cong. & Admin.News 1448, 1450.

The AAA requires a participating state to designate an authority to establish and maintain reasonable, nationally-recognized standards for foster homes and child care institutions. 42 U.S.C. § 671(a)(10). The state is given the duty to report conditions of "neglect, abuse, or exploitation" in foster homes to the appropriate court or law enforcement agency. 42 U.S.C. § 671(a)(9). The state must establish annual goals for limiting the number of children remaining in foster care for more than two years. 42 U.S.C. § 671(a)(14). Moreover, it must make "reasonable efforts" before a child is placed "to prevent or eliminate the need for removal of the child from his home" and "to make it possible for the child to return to his home." 42 U.S.C. § 671(a)(15). Finally, the state is required to create a "case plan" and implement "a case review system" for each child in foster care.[7] 42 U.S.C. § 671(a)(16).

Although the AAA is styled an appropriations statute, the courts have found it to be privately enforceable, either under 42 U.S.C. § 1983 or by direct action. *See, e.g. L.J. v. Massinga*, 838 F.2d 118, 123 (4th Cir.), *cert. denied*, 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989) (provisions requiring maintenance of reasonable standards, case plan and case review system, and reporting of neglect enforceable); *Lynch v. Dukakis*, 719 F.2d 504, 509–512 (1st Cir.1983) (private right of action to enforce provision requiring case plan and case review system); *B.H. v. Johnson*, 715 F.Supp. 1387, 1402 (N.D.Ill.1989) (same); *see also Del A. v. Edwards*, 855 F.2d 1148, 1151 (5th Cir.1988) (discussing but not deciding the question). However, only those provisions which clearly "spell out a standard of conduct" may be enforced. *L.J.*, 838 F.2d at 123. As the Supreme Court stated in *Pennhurst State School and Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539–40, 67 L.Ed.2d 694 (1981), a federal funding statute such as the AAA is

much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' ... [Thus,] if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.

Accordingly, with regard to the AAA, courts refuse to enforce "vague" or "amorphous" provisions, or to create additional requirements not mentioned in the statute but merely "consistent with [its] purpose." *Aristotle P. v. Johnson*, 721 F.Supp. 1002, 1012 (N.D.Ill.1989) (no right to placement in the most family-like setting, "reasonable efforts to reunify families," or "meaningful sibling visitation"); *see also B.H.*, 715 F.Supp. at 1401 (no enforceable right to placement in the most family-like setting or reasonable efforts to help child remain in home); *but see Artist M. v. Johnson*, 726 F.Supp. 690, 695 (N.D.Ill.1989) (implied private right of action with respect to "rea-

---

7. The case review system requires periodic review of each child's status. It also mandates procedural safeguards with respect to the long-term disposition of the child, to "parental rights pertaining to the removal of the child from the home of his parents, to a change in the child's placement, and to any determination affecting visitation privileges of parents." 42 U.S.C. § 675(5).

sonable" preventive and reunification services; "the use of the word 'reasonable' in a statutory provision does not render the requirement too vague or ambiguous to be enforced").

The only court to have addressed the issue of visitation rights under the AAA has concluded that the Act does *not* create an enforceable right to "meaningful visitation" between parents and children. *See Scrivner v. Andrews*, 816 F.2d 261, 264 (6th Cir.1987).[8] This court agrees.

Visitation between parent and child is certainly not an explicit requirement of the Act. The plaintiffs' best argument that visitation is nonetheless essential is the claim that it is fundamental to the "reasonable efforts" on the part of the state to reunify families, arguably required by the Act under 42 U.S.C. § 671(a)(15). The plaintiffs have presented evidence indicating that frequent visits between parent and child are helpful in leading to the eventual reunification of the family.[9]

A state may indeed be required to include in its program some services directed toward the goal of family reunification. However, the AAA cannot be read to require the states to provide a particular quantum of supervised visitation, or even any visitation at all. The state might provide other reunification services which it considered more appropriate. As the court remarked in *Scrivner*, with respect to the case review provision, while a state must comply with the "minimum requirements" set forth in the statute, "it is otherwise afforded considerable flexibility in unilater-

ally developing procedures compatible with its own unique foster care circumstances." 816 F.2d at 263 (citing *State of Vermont Dep't of Social and Rehabilitation Servs. v. United States Dep't of Health and Human Servs.*, 798 F.2d 57, 60 (2d Cir.), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 950, 93 L.Ed.2d 999 (1987)); *see Youngberg v. Romeo*, 457 U.S. 307, 317, 102 S.Ct. 2452, 2459, 73 L.Ed.2d 28 (1982) (state "has considerable discretion in determining the nature and scope of its responsibilities").

■ A state which made no effort to return children temporarily in state custody to their parents might be in violation of the AAA. That is not the case here. First, CYS regularly provides supervised visitation services. Second, state regulation requires the agencies to provide "placement prevention and reunification services" which include counseling, parent education, and homemaker services. 55 Pa.Code §§ 3130.34, .35 (1988). Finally, the court notes that physical custody of Samuel, Jr. was returned to his father after approximately six months. Under these circumstances, it cannot be said that CYS's visitation policy violates the AAA.

## B. SUBSTANTIVE DUE PROCESS

The plaintiffs also claim that the visitation policy deprives them of fundamental rights guaranteed by the First, Fourth, Ninth, and Fourteenth Amendments to the United States Constitution.[10] According to the plaintiffs, because parents and children possess a fundamental liberty interest in

---

**8.** In *Scrivner*, the plaintiff's eight-month-old child was removed from her custody and placed in a foster home. The plaintiff was permitted to visit her child for one hour every other week. She was not informed that she had the right to contest the visitation schedule. Later, she did contest the schedule, and the foster care service expanded her visitation privileges. The plaintiff contended that "as a result of the defendants failure to inform [her] of her right to an administrative hearing to contest the initial visitation schedule, both [she] and [her daughter] were deprived of their joint federal right to 'meaningful visitation'" which was secured to them by the Act. 816 F.2d at 262.

**9.** The plaintiffs' expert, Dr. David Fanshell, testified to the importance of visitation between a

child and its parents when reunification is the goal. The defendants do not dispute the importance of visitation, only the amount needed to ensure a successful reunification.

**10.** The plaintiffs also claim that they have a right to family integrity, encompassed in the First Amendment's right to freedom of association, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984); *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), and the zone of privacy created by the First and Ninth Amendments, *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

maintaining their family relationship, the state cannot interfere with this right without a compelling interest. This interest, they allege, is impermissibly violated when a parent is denied meaningful visitation with a child whose custody has been committed to the state. According to the plaintiffs, limiting visitation below an acceptable minimum adds to the trauma of involuntary separation, destroys existing family bonds, and frustrates the goal of reuniting natural parents with their children.

It has long been recognized that parents have a fundamental liberty interest "in the care, custody, and management of their child." *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599 (1982); *see also Lassiter v. Dep't of Social Servs.,* 452 U.S. 18, 27, 101 S.Ct. 2153, 2159–60, 68 L.Ed.2d 640 (1981); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972). This interest is protected by substantive due process. *See Fanning v. Montgomery County Children and Youth Servs.,* 702 F.Supp. 1184, 1190 (E.D.Pa.1988); *Rinderer v. Delaware County Children and Youth Servs.,* 703 F.Supp. 358, 361 (E.D. Pa.1987).

■ The parents' liberty interest in a relationship with their child continues even when custody has temporarily been granted to the state or when custody has been granted to another parent. Thus, for example, the parents of a child in the temporary custody of the state may invoke constitutional protections when permanent loss of custody is threatened. *See Santosky,* 455 U.S. at 753, 102 S.Ct. at 1394–95 (due process requires that "permanent neglect" be found by "clear and convincing evidence" before parental rights may be terminated). Further, the non-custodial single, separated, or divorced parent has a liberty interest in his or her right to communicate with and visit the child. *See, e.g., Prisco v. United States Dep't of Justice,* 851 F.2d 93, 97 (3d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 2428, 104 L.Ed.2d 985

(1989) (non-custodial parent has right to notice and a hearing when child is placed in Witness Protection Program); *Ruffalo by Ruffalo v. Civiletti,* 702 F.2d 710, 715 (8th Cir.1983) (same); *Franz v. United States,* 707 F.2d 582 (D.C.Cir.1983) (same); *see also Williams v. Carros,* 576 F.Supp. 545, 547 (W.D.Pa.1983) ("[R]egular and appropriate visits between [a mother] and her children ... and appropriate visits between the children ... are fundamental liberty interests protected by the Constitution.") (dictum).

■ However, this liberty interest is not absolute. The state may intervene in the relationship between parent and child where intervention serves the interests of the state or the interests of the child. *Woodrum v. Woodward County,* 866 F.2d 1121, 1125 (9th Cir.1989). Nor, in this situation, is the state's intervention subject to the compelling interest test. As the Supreme Court stated in *Youngberg,* 457 U.S. at 322, 102 S.Ct. at 2461: "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals.... At the same time, this standard is lower than the 'compelling' or 'substantial' necessity tests." (citations omitted).

Once it has been determined that the state is justified in removing a child from the home,[11] it seems unlikely that the Due Process Clause requires the state to make substantial efforts to reunify the family. The Due Process Clause "generally confers no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989); *see also Youngberg,* 457 U.S. at 317, 102 S.Ct. at 2459 ("As a general matter, a State is under no constitutional duty to provide substantive services for those within its borders"). *San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct.

---

**11.** The Winstons do not challenge the legitimacy of the Commonwealth's initial action in taking custody of Samuel, Jr. away from them.

1278, 36 L.Ed.2d 16 (1973) (no fundamental right to public education); *Child v. Beame,* 412 F.Supp. 593, 603 (S.D.N.Y.1976) (children in state custody have no constitutional right to adoption into a stable and permanent family).[12]

■ It is true that the Due Process Clause requires the state to provide children in foster care with their basic needs— "minimally adequate food, clothing, shelter, medical care, safety, freedom from bodily restraint and reasonable training to ensure the latter two rights." *Doe v. New York City Dep't of Social Servs.,* 670 F.Supp. 1145, 1172 (S.D.N.Y.1987), *appeal after remand,* 709 F.2d 782 (2d Cir.1983). *See DeShaney,* 109 S.Ct. at 1005 (state obligated to provide involuntarily committed mental patients with "adequate food, shelter, clothing, and medical care," *citing Youngberg,* 457 U.S. at 314–25, 102 S.Ct. at 2457–63 (dicta)); *see also B.H.,* 715 F.Supp. at 1396. However, the Fourteenth Amendment does not mandate an optimal level of care and treatment. *DeShaney,* 109 S.Ct. at 1005 n. 7; *Society for Good Will v. Cuomo,* 737 F.2d 1239, 1250 (2d Cir.1984); *B.H.,* 715 F.Supp. at 1397.

■ In determining the minimum level of care and treatment required by the Fourteenth Amendment, the Supreme Court adopts a standard of reasonableness as determined by the prevailing professional standards in a given area.

[T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judg-

ment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment.

*Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462. Here, CYS submitted two affidavits stating that the visitation policy was made by professionals and is within professionally accepted standards. The plaintiffs' expert, Dr. David Fanshell, described the visitation policy as "minimalist" but did not characterize it as a departure from professional standards. In fact, when asked on cross-examination whether any other jurisdictions in the nation require weekly visits, Dr. Fanshell admitted that he knew of none. An affidavit submitted by CYS of other states' minimum visitation requirements found none that exceeded, and several which fell below, Pennsylvania's requirements. Thus, CYS' requirements neither depart from the bounds of professional judgment nor from professional practice.

■ The plaintiffs' final argument is that despite the practices of all other states and the reliance by CYS upon professionals, CYS' visitation policy nonetheless "shocks the conscience" and thus violates the Fourteenth Amendment's substantive Due Process Clause. *See Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952); *see also Black v. Stephens,* 662 F.2d 181, 188 (3d Cir. 1981). Although CYS' visitation policy is far from ideal, it does not represent the sort of callousness, brutality, or corruptness which has shocked the conscience of other judges.[13]

---

**12.** The plaintiffs argue that they are not seeking affirmative services from the state; rather, they claim that they are seeking only to enforce their Fourteenth Amendment substantive due process right and their First Amendment right to freedom of association. I disagree with the plaintiffs' characterization of CYS' services, because in order for CYS to provide more visitations between children and parents, CYS must make more office space available, provide more staff supervision, and make more transportation arrangements. As noted, on four separate occasions CYS brought the Winstons' child to see Mrs. Winston while she was hospitalized; this was clearly an affirmative service.

**13.** In *Rochin,* for example, the conduct found shocking to the conscience of the Court included "[i]llegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, [and] the forcible extraction of his stomach's contents. . . ." 342 U.S. at 172, 72 S.Ct. at 209. In *Black* the conduct involved a police "officer brandish[ing] his revolver eighteen inches from [the plaintiff's] head with [the plaintiff's wife] in the precise line of fire and then threaten[ing] to shoot." 662 F.2d at 189.

### III. CONCLUSION

For the foregoing reasons, I conclude that defendant CYS' visitation policy and the Department's regulations governing that policy violate neither the AAA nor the First, Ninth, and Fourteenth Amendments to the Constitution.

An order follows.

### ORDER

AND NOW, upon consideration of the plaintiffs' arguments and evidence, and the defendants' response thereto, IT IS ORDERED that JUDGMENT is entered in favor of the defendants and against the plaintiffs.