**B.H., C.H., J.E. and C.Z., individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**Gordon JOHNSON, Director of the Illinois Department of Children and Family Services, Defendant.**

No. 88 C 5599.

United States District Court, N.D. Illinois, E.D.

May 30, 1989.

Michael L. Brody, Schiff, Hardin & Waite and Benjamin S. Wolf, Roger Baldwin Foundation of ACLU, Inc., Chicago, Ill., for plaintiffs.

Susan Getzendanner and Christina M. Tchen, Skadden, Arps, Slate, Meagher & Flom, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

GRADY, Chief Judge.

This case comes before us on defendant's motion to dismiss. We grant the motion in part.

### FACTS

For purposes of this motion, we accept all well-pleaded facts as true and draw reasonable inferences in favor of plaintiffs. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Named plaintiffs, B.H., C.H., J.E., C.Z., E.G., O.G., S.G., C.G., P.G., and A.G., represent a class of "all persons who are or will be in the custody of the Illinois Department of Children and Family Services and who have been or will be placed somewhere other than with their parents" (hereinafter collectively referred to as "plaintiffs"). *See* Order 88 C 5599 (N.D.Ill. Feb. 22, 1989) (certifying plaintiffs as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure).

Defendant Gordon Johnson ("Johnson") is the director of the Illinois Department of Children and Family Services ("DCFS"). He is sued only in his official capacity. DCFS is an Illinois state agency responsible for the welfare of children whose parents are unwilling or unable to care for them. Amended Complaint at ¶ 10. As of the date of filing of the complaint, 15,000 children were in the custody of the DCFS. Am.Compl. at ¶ 9(a). When a child is removed from his or her parents, a "follow-up" caseworker is assigned to take responsibility for the child. Am.Compl. at ¶ 11. According to DCFS procedures, "the follow-up caseworker is to work with the family, arrange for appropriate services—for example, homemakers, counselors, therapists, and day care—and oversee the child's welfare including his or her medical needs, education, and, if the child is not immediately returned home, placement in a foster home, group home, or institutional care facility." *Id.*

The facts, as alleged in the complaint, paint a bleak and Dickensian picture of life under the auspices of the DCFS. Plaintiffs assert that there is little hope that children in the custody of the DCFS will receive services to which they are entitled. *Id.* at ¶ 12. Of the approximately 15,000 children in defendant's custody, more than 4,000 have been prevented from returning to their parents for two years or more. Am. Compl. at ¶ 21(a). As of June 30, 1986, more than 4,300 children in DCFS care had been in six or more placements. *Id.* at 21(b). These placements usually involve extended stays in mental hospitals, detention centers, group homes, shelters, and other institutions. Some children are kept in mental institutions long after professionals responsible for their treatment have declared them ready for discharge. *Id.* at 21(c). The institutions in which plaintiffs are "warehoused" do not offer adequate educational opportunities or, indeed, activities of any sort. Plaintiffs claim that the behavior of the children who reside in these institutions is controlled by brutal physical discipline. *Id.* These institutions are incapable of serving the needs of children and often cause serious damage to their physical and emotional well-being. In one DCFS shelter in May 1988, an eight-year-old girl was raped by two twelve-year-old boys. *Id.* at ¶ 16.

The institutional disrepair of DCFS is illustrated by the experience of the named plaintiffs in this case. For convenience, we allow the complaint to tell its own story:

(a) B.H. is a 17 year old male who has been lost in the DCFS system for four years. After removal from the custody of his family, DCFS put B.H. in a series of at least 10 different placements, including repeated placements for extended periods of time in temporary shelters. One of the non-temporary placements provided by DCFS was so inappropriate that B.H. faked a suicide attempt in order to secure a new living arrangement. Although he is an honor student, having maintained a 3.9 grade point average last year during his junior year at Maine West High School, B.H.'s education has been disrupted so many times that he did not graduate with his high school class this spring. As of the date of his interview with counsel in preparation for filing this lawsuit, B.H. was in a temporary shelter once again, had no recollection of having seen his caseworker for three months and recalled only two telephone conversations with the caseworker during that period.

(b) C.H. is a 15 year old male who has been in the DCFS system for less than six months. During that period of time he has had five different placements. As of the date of the original complaint, C.H. had been in a temporary shelter for four months. C.H. was removed from his mother's home after he had a confrontation with her boyfriend. Despite the obvious family tensions, as of the date of his interview with counsel in preparation for filing this lawsuit, C.H. and his mother had received no joint counselling or other support from DCFS seeking safely to reunite the family, and C.H. had not, to the best of his recollection, seen his caseworker for a month.

(c) J.E. is a 13 year old male who has been in the custody of DCFS as long as he can remember. J.E. wants to be reunited with his grandmother or his biological mother, who has told him she wants him back, but he has no recollection of any joint counsel-ling with his mother during the years that he has been in DCFS' custody. J.E. has not had any counseling from DCFS at all for the last several months. Instead, he was warehoused for the three months prior to the filing of this lawsuit at the Henry Horner Children's Center ("Henry Horner"), an overcrowded, understaffed mental health facility which controls his behavior by administering strong doses of psychotropic mediation [sic]. J.E. constantly fears for his physical safety at Henry Horner, where assaults are a frequent occurrence. He has had numerous caseworkers during his time with DCFS and he rarely sees his current caseworker. J.E. has been placed in a series of foster and institutional placements and removed from the one foster family with whom he was able to form a bond. During the time J.E. has been in the custody of DCFS he has threatened suicide.

(d) C.Z. is a 17 year old female honor student who was placed in DCFS' custody approximately one year ago because she alleged she was sexually abused by her stepfather. During her year with DCFS, C.Z. has been in seven different placements. C.Z. has received no meaningful help from DCFS in her efforts to cope with the events giving rise to her allegations of abuse by her stepfather or the deterioration of her relationship with her mother. On information and belief, solely because DCFS had no appropriate placement for her, on two separate occasions C.Z. remained in a locked ward at Henry Horner long after the specific recommendations of mental health officials that she was ready for discharge. Prior to contact with counsel in preparation for filing this lawsuit, C.Z. had not seen her caseworker for two months. On one occasion, C.Z. slit her wrists in order to get the attention of the DCFS worker then in charge of her case.

(e) E.G. and O.G. have been in DCFS's custody since October 9, 1987. DCFS has been involved with their family since October 1986 when O.G. severed his palate with a stick and hospital personnel called the case to DCFS's attention. Subsequent investigation revealed that E.G. and O.G., along with their siblings, A.G., P.G., S.G., and C.G., were kept by their parents locked in a feces and urine infested bedroom, that they were undernourished, that their medical needs were ignored, and that they were otherwise neglected. Between October 1986 and October 1987 DCFS' only effort to provide services to the G. family consisted of sending a homemaker to clean the apartment. The homemaker stopped visiting after being threatened by E.G.'s and O.G.'s heroin addict father. At the time of their removal from their home, E.G. was 3 and O.G. was 6. In the year since they were removed from their home, E.G. and O.G. have been in a total of 8 different placements. In one of the placements, E.G. and O.G. were inadequately fed and clothed. They were removed from another placement because they were both "hit" by the foster mother. In a third placement O.G. was sexually abused. Notwithstanding that he was initially removed from his parents home because of the neglect which caused his severed palate, plaintiffs are informed and believe that E.G. has never received any speech therapy to help him cope with his physical handicap and he has never been evaluated for reconstructive surgery. As of October 28, 1988 DCFS had not made any arrangements to provide O.G. with counselling in order to help him deal with his sexual abuse and, in response to the current foster parents' inquiry on the subject, the DCFS caseworker had threatened to remove E.G. and O.G. from the new foster home if the foster parent continued to "cause trouble" by insisting on such critical services.

(f) S.G., C.G., P.G. and A.G. are the brothers and sisters of E.G. and O.G. They range in age from one year to nine years. All of them have been placed together with the O'C. family, a different foster placement from E.G. and O.G. The separated children have not received scheduled monthly visits and, despite repeated requests from the O'C.s, DCFS has flatly refused to even schedule sibling visits on a weekly basis. Several of the G children have special needs. P.G., for example, was a premature baby who continues to suffer from a weak heart and asthma. C.G. has a variety of behavioral problems. Notwithstanding these needs, DCFS failed to fund for periods of six and eight months legitimate babysitting and other expenses associated with care of the G children, including, for example, funds for participation in various neighborhood and school programs designed to assist C.G. Even after funding has been promised for these expenses, actual payments have not been forthcoming and, at present, the foster parents are able to obtain babysitting they need in order to get P.G. to his various doctors' appointments only through the cooperation of a friend who is owed money for more than six weeks of work. By reason of DCFS' lack of cooperation with the O'C family, DCFS has forced the foster parents to the choice of either advancing literally hundreds of dollars to pay for services the state should provide, ignoring the childrens' [sic] needs for such services or abandoning the children to another placement.

Am. Compl. at ¶ 22.

According to plaintiffs, Johnson has ignored the systemic problems that plague the DCFS. He has assigned too many cases to the follow-up workers responsible for working with children. Plaintiffs claim that Johnson typically assigns sixty or more cases to a single caseworker; DCFS

studies and national social science surveys indicate that follow-up caseworkers cannot perform their essential duties competently if they are assigned to more than twenty cases at a given time. Am. Compl. at ¶ 13. Further, defendant has failed to ensure that necessary services to reunite families, such as homemakers, day-care and counseling, are available on a timely basis. Plaintiffs assert on information and belief that, at the time of filing the amended complaint, defendant Johnson had all but ceased to provide essential services to children, their parents and foster parents. Am. Compl. at ¶ 14. The shortage of services results in thousands of children being separated from parents and siblings for years, causing serious and irreparable harm to their mental health and development. Defendant typically places children not based on their needs, but rather because a foster home or institution will accept the child. This practice results in multiple, unsuitable placements for siblings and drives foster parents out of the system. Am. Compl. at ¶ 15. The failure of foster parents to participate in the system results in the warehousing of children for months or years in unsuitable and dangerous shelters maintained by DCFS.

Plaintiffs further allege that defendant is slow to react to reports of child abuse and neglect. According to plaintiffs, approximately twenty-five percent of the reports of abuse and neglect received by the DCFS in the first nine months of 1987 concerned families that had at least three or more prior reports of abuse and neglect which DCFS had failed to investigate. Am. Compl. at ¶ 18. Over the years, in response to increasing reports of child abuse and neglect, defendant has called for legislative initiatives, more severe criminal penalties, punishment for case workers or study of the issue. He has also announced with "much public fanfare," Am. Compl. at ¶ 20, "pilot" programs which have been successful, where implemented, but defendant has not made such programs available to all children in need of them. *Id.* Over the last few years, hundreds of children in

DCFS' custody have been subjected to the exact type of abuse that caused the state to assume custody of them in the first place. The children in substitute care experience neglect or abuse at a rate at least twice that experienced by children in the Illinois population as a whole. Am. Compl. at ¶ 8.

DISCUSSION

Plaintiffs allege that defendant "knowingly, intentionally and with deliberate indifference to the rights of plaintiffs maintained the conditions and policies described in this Complaint," Am.Compl. at ¶ 25, and that, as a "direct and proximate result" of defendant's conduct, plaintiffs have suffered, and continue to suffer, irreparable harm to their mental health and development, emotional distress, humiliation, anxiety, and pain. Am. Compl. at ¶ 26. Count I states constitutional claims; Count II states federal statutory claims. Under both counts plaintiffs request this court to (a) issue a declaratory judgment that the policies and practices complained of violate the Fourteenth Amendment; (b) grant an injunction requiring defendant to submit a plan assuring legally adequate care and treatment for plaintiffs; (c) appoint a master pursuant to Rule 53 of the Federal Rules of Civil Procedure to determine the adequacy of defendant's plan and to oversee its implementation;[1] (d) expressly reserve the right of individual class members to bring individual lawsuits for damages; (e) award costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and (f) grant any such additional relief as the court believes just and proper. Am. Compl. at ¶¶ 28, 30.

*Count I: Constitutional Claims*

■ The initial inquiry in a § 1983 action is whether the conduct complained of deprived the plaintiffs of a right, privilege, or immunity secured by the Constitution or the laws of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). Plaintiffs contend that defendant violated their constitutional rights "to family privacy and autono-

---

1. Although they do not expressly say so, plaintiffs apparently wish us to appoint Joseph Mon-

ahan as the master. His qualifications are set out in paragraph 7 of the amended complaint.

my, freedom of association, safe and humane conditions and treatment, freedom from bodily restraint, due process and equal protection of the law." Am.Compl. at ¶ 28. Specifically, plaintiffs argue that defendant has failed to place plaintiffs in the least restrictive setting and to "provide those services reasonably necessary to reunite plaintiffs with their parents," *id.* at ¶ 28(a), that defendant placed plaintiffs in conditions that "shock the conscience" and put their emotional and physical well-being at serious risk, *id.* at ¶ 28(b), that defendant has failed "to provide plaintiffs with minimally adequate shelter, supervision, treatment and services," *id.* at ¶ 28(c), and that defendant, without due process of law, "has deprived plaintiffs of their protectible liberty and property interests to an individualized, program-oriented plan for their care; appropriate services to re-unify them with their families; and services necessary to their proper development, health and education, pursuant to Ill.Rev.Stat. ch. 23, ¶¶ 2052, 5005, 5006a and Ill.Rev.Stat. ch. 37, ¶ 801–2(3)(b)." *Id.* at 28(d). Defendant seeks to dismiss Count I pursuant to Federal Rule of Civil Procedure 12(b)(6), on the ground that plaintiffs have failed to state a claim upon which relief can be granted.

Substantive Due Process

Defendant argues that plaintiffs are seeking to impose upon the state, via the Fourteenth Amendment, a duty to provide its citizens with substantive services. As defendant correctly points out, the Fourteenth Amendment does not obligate the state to provide substantive services for its citizens. The Due Process Clause provides that a state shall not "deprive" residents of life, liberty and property without due process of law. The Seventh Circuit has explained the origin of the Fourteenth Amendment:

> [The Due Process Clause] is a charter of negative rather than positive liberties. The men who wrote the Bill of Rights were not concerned that government might do too little for the people but that it might do too much to them. The Fourteenth Amendment, adopted in 1868 at the height of laissez-faire thinking,

sought to protect Americans from oppression by state government, not to secure them basic governmental services. *Jackson v. City of Joliet,* 715 F.2d 1200, 1203 (7th Cir.1983), *cert. denied,* 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984) (citations omitted). *See also Jackson v. Byrne,* 738 F.2d 1443, 1446 (7th Cir.1984) (Due Process Clause does not require city to rescue victims of fire or to provide firefighting services); *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982) (Due Process Clause does not require the state to imprison maniacs or protect its citizens from them).

While the language of the Due Process Clause merely prohibits certain state action, the clause has been held to impose positive duties on the state in limited circumstances. A line of Supreme Court cases has acknowledged that substantive due process rights may emanate from a state's positive exercise of its power. In *Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976), the Supreme Court held that the Eighth Amendment's prohibition against cruel and unusual punishment requires the state to provide adequate medical care to incarcerated prisoners. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court extended this analysis beyond the Eighth Amendment setting, holding that the substantive component of the Fourteenth Amendment's Due Process Clause requires the state to provide involuntarily committed mental patients with such services as are necessary to ensure their reasonable safety from themselves or others. *Id.* at 314–25, 102 S.Ct. at 2457. The Court in *Youngberg* reasoned that "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions." *Id.* at 315–16, 102 S.Ct. at 2458. The Court also noted that the state is obligated to provide an individual in its care with "adequate food, shelter, clothing and medical care ... and such training as an appropriate professional

would consider reasonable to ensure his safety and to facilitate his ability to function free from bodily restraints." *Id.* at 324, 102 S.Ct. at 2462. *See also, Spence v. Staras,* 507 F.2d 554 (7th Cir.1974) (estate of child inmate of mental institution who was beaten to death by fellow inmates of mental institution had a valid due process claim against state hospital officials who were aware that child had been beaten in the past, but failed to take steps to protect him). *Society for Good Will to Retarded Children v. Cuomo,* 737 F.2d 1239, 1245–46 (2d Cir.1984), extended *Youngberg* to any person in state custody and held that the state was required to exercise accepted "professional judgment" in safeguarding the security of children in its custody. *See also Doe v. Lambert,* No. 87 C 8150, 1988 WL 37839(N.D.Ill. April 19, 1988) (Kocoras, J.) (child has § 1983 claim against DCFS for injuries he received while in the foster home); *Rubacha by Rubacha v. Coler,* 607 F.Supp. 477, 479 (N.D.Ill.1985) (Shadur, J.) (mentally retarded juvenile placed in DCFS–run shelter who was attacked and beaten by residents stated a Fourteenth Amendment cause of action against DCFS employees and officials).

Taken together, these cases stand for the proposition that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cty. Soc. Servs. Dept.,* ⸺ U.S. ⸺, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989). *See also Youngberg,* 457 U.S. at 317, 102 S.Ct. at 2458 ("when a person is institutionalized—and wholly dependent on the state ... a duty to provide certain services and care does exist"). The Court in *DeShaney* explained the principle unifying *Estelle* and its progeny:

> The rationale ... is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*DeShaney,* ⸺ U.S. ⸺, 109 S.Ct. at 1005. The controlling standard for determining whether those rights have been violated is whether "professional judgment in fact was exercised." *Youngberg,* 457 U.S. at 321, 102 S.Ct. at 2461 (quotation omitted). The constitutional norm is violated "only when the decision by the professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. at 2462 (footnote omitted).

■ Defendant argues that, while he may be responsible for the physical well-being of plaintiffs while they are in his direct custody, he is not responsible for their emotional well-being. We cannot accept that DCFS does not assume some responsibility for the emotional as well as physical well-being of children in its care. In *White v. Rochford,* 592 F.2d 381 (7th Cir.1979), the court held that the unjustified and arbitrary refusal by police officers to lend aid to children endangered by the officers' performance of their official duties gave rise to substantive due process rights. Judge Sprecher, speaking for the court, concluded that "the protections of the Due Process Clause against arbitrary intrusions on personal security includes both physical and emotional well-being." *Id.* at 385.

Defendant questions the precedential value of *White,* noting that the three-member panel was completely splintered, with Judge Tone concurring and Judge Kilkenny dissenting.[2] Defendant further attacks

---

2. We disagree with defendant's assertion that Judge Tone specifically rejected the emotional well-being component of Judge Sprecher's holding. True, Judge Tone, in his concurring opinion, did not mention the phrase "emotional well-being," confining his holding instead to a right to "personal security." However, in our view, Judge Tone's opinion is of little precedential value because it offers both a narrow and broad definitions of "personal security." First, Judge Tone interpreted the phrase "personal security" as a shorthand paraphrase of

Judge Sprecher's holding on the ground that it mistakenly relied on *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). *Carey* involved a procedural due process claim of students who had been improperly suspended from school without benefit of post-deprivation remedies. At issue were the damages that plaintiffs could recover under § 1983 for such procedural deprivation. While the Court acknowledged that damages are available under § 1983 for denial of procedural due process, it did not hold that causing emotional distress, *per se,* was a constitutional violation. Thus, defendant argues, Judge Sprecher's reliance on *Carey* for the proposition that the Fourteenth Amendment protects an individual from unreasonable intrusion upon his or her emotional well-being is misplaced and consequently his holding may be overly broad.

We adopt Judge Sprecher's holding that a child who is in the state's custody has a substantive due process right to be free from unreasonable and unnecessary intrusions on both its physical and emotional well-being. Our conclusion is grounded in common sense: A child's physical and emotional well-being are equally important. Children are by their nature in a developmental phase of their lives and their exposure to traumatic experiences can have an indelible effect upon their emotional and psychological development and cause more lasting damage than many strictly physical injuries. Moreover, while courts are careful to draw a distinction between substantive rights and items of damage flowing from breach of a substantive right, the distinction is often more apparent than real, particularly where emotional distress is concerned. Indeed, other courts have followed the holding in *White v. Rochford,* despite its seemingly misplaced reliance on *Carey. See, e.g., Mendez through Mendez v. Rutherford,* 655 F.Supp. 115 (N.D.Ill. 1986). In *Mendez,* the court refused to

dismiss a § 1983 action brought by a three-year-old girl against two police officers based on events surrounding the arrest of her father. The child alleged that she had suffered emotional distress, in violation of her substantive due process rights, while watching the police pull her father from the car, beat him up, and arrest him. In recognizing the validity of the plaintiff's claim of substantive due process violation, the court noted that *White*'s recognition that the D Process Clause guards against arbitrary intrusions on both physical and emotional well-being continued to receive the Seventh Circuit's approval. Furthermore, the Seventh Circuit, in *Jackson,* 715 F.2d at 1204, while rejecting the argument that the city of Joliet had a substantive obligation to aid victims of a car accident, was careful to distinguish *White.* In *White* "the arrest created the danger to the children; [in *Jackson* ] the plaintiff's decedents were in great danger before the plaintiffs appeared." *See also Crawford v. Garnier,* 719 F.2d 1317, 1324 (7th Cir.1983) (personal distress and emotional pain and suffering are compensable in a § 1983 action, citing *White v. Rochford* ).

Cases cited by defendant do not compel a contrary conclusion because they do not involve children in state custody. Rather, they concern claims to freedom from emotional harm brought by members of the general public. *See Conner v. Sticher,* 801 F.2d 1266, 1269 (11th Cir.1986) (there is no protectible constitutional interest to support a claim for damages for mental distress which results from legitimate police activity not intended to cause injury). *Cameron v. I.R.S.,* 773 F.2d 126, 129 (7th Cir.1985) (noting that the facts of the case were "bizarre," the court rejected a *Bivens* action involving allegations of IRS harassment in collection of taxes and stressed that "[n]ot every interference with peace of mind" is a deprivation within the meaning

"bodily restraint and corporal punishment." *Id.* at 387 n. 2 (quoting *Ingraham v. Wright,* 430 U.S. 651, 674 n. 43, 97 S.Ct. 1401, 1414 n. 43, 51 L.Ed.2d 711 (1977)). Later, Judge Tone noted that "personal security can hardly consist only of freedom from direct bodily harm and exclude what will often be more important, free-

dom from unnecessary and unjustifiable exposure to physical damage or injury to health." Presumably, "injury to health" refers to emotional well-being because it is stated in the alternative to "physical damage;" Judge Tone's narrower definition of "personal security" focuses only on physical well-being.

of the Constitution); *Buikema v. Hayes*, 562 F.Supp. 910, 911 (N.D.Ill.1983) (a wife has no § 1983 claims of emotional distress arising out of alleged police violations of her husband's civil rights).

Defendant further argues that if he relinquishes direct control of a child to foster parents or other private institutional care, he losses responsibility for the well-being of the child. In *DeShaney*, the court left open the question of whether the state may be liable "under the Due Process clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents." *DeShaney*, — U.S. —, 109 S.Ct. at 1006 n. 9. We hold that a child has a § 1983 action against the state for injuries suffered while in foster care where the state is deliberately indifferent to the likelihood that a foster home is unsafe, yet places a child there or allows the child to remain there. In *Taylor By and Through Walker v. Ledbetter*, 818 F.2d 791, 799 (11th Cir.1987) (*en banc*), *cert. denied sub nom., Ledbetter v. Taylor*, — U.S. —, 109 S.Ct. 1337, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989), the Eleventh Circuit upheld a due process claim by a foster child, who had sued state and county officials responsible for her placement in a foster home, for injuries received while she was in the physical custody of the foster parents. The court held that "a child involuntarily placed in a foster home is in a situation ... analogous to a prisoner in a penal institution and a child confined in a mental health facility...." *Id.* at 797. The court premised its conclusion on the fact that the state authorities, by assuming custody of the child, had cut off the child's avenues of self-help:

> We believe the risk of harm is great enough to bring foster children under the umbrella of protection afforded by the fourteenth amendment. Children in foster homes ... are isolated; no persons outside the home setting are present to witness and report mistreatment. The

children are helpless. Without the investigation, supervision, and constant contact required by statute, a child placed in a foster home is at the mercy of the foster parents.

*Id.* The Second Circuit has held to the same effect. *See Doe v. New York City Dept. of Social Services*, 649 F.2d 134, 141–42 (2d Cir.1981), *cert. denied sub nom., Catholic Home Bureau v. Doe*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). Our conclusion is also supported by at least two decisions in this district. *See Doe v. Lambert*, No. 87 C 8150 (N.D.Ill. April 19, 1988) (Kocoras, J.) (child has § 1983 substantive due process claim against DCFS for injuries he suffered while in foster care); *Doe v. Bobbitt*, 665 F.Supp. 691, 697 (N.D.Ill.1987) (Duff, J.) (complaint stated valid Fourteenth Amendment cause of action against state agency where a state agent removed child from home and placed him in a foster home which the agent suspected was unsafe and in which the child was injured).

In sum, plaintiffs have stated a substantive due process claim to be free from unreasonable and unnecessary intrusions upon their physical and emotional well-being, while directly or indirectly in state custody, and to be provided by the state with adequate food, shelter, clothing and medical care and minimally adequate training to secure these basic constitutional rights.[3] Children in indirect state custody includes children who have been placed by the state in foster care or other non-state institutions. The controlling standard for determining whether those rights have been violated is whether "professional judgment in fact was exercised." *Youngberg*, 457 U.S. at 321, 102 S.Ct. at 2461 (quotation omitted).

Plaintiffs also allege that defendant has violated their substantive due process rights by failing to provide training necessary to reunite them with their families, to

---

**3.** Defendant points out that plaintiffs do not allege that defendant has deprived them of adequate food, shelter, clothing and medical care. Although plaintiffs do not use these specific words, we can reasonably infer the existence of the claim from the acts complained of. The alleged brutal disciplinary measures used by the state to control children within their care certainly raises concern about the adequacy of state shelter and medical supervision.

ensure parental and sibling visitation, stable placement in the least restrictive setting possible, and an adequate number of follow-up case workers. So framed, plaintiffs' claims fail to draw a distinction between a family's right to be free from state intrusion and the state's purported obligation to ensure family reunification. The Supreme Court has long recognized that "freedom of personal choice in matters of ... family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974). There exists a realm of private life that a state cannot enter, *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944), and which has been afforded both substantive, *Moore v. East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), and procedural, *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972), due process protection. Nevertheless, while the cases relied upon by plaintiffs emphasize the sanctity and privacy of familial association and the right to be free from improper state intrusion, they do not impose an obligation on the state to make efforts to reunify families that have been separated by legitimate state intervention.[4] The right to family privacy places a limitation on the state's theater of activities; to

impose an obligation on the state to allocate resources with a view to achieving family reunification would run contrary to the established principle that the state is not obligated under the Fourteenth Amendment to provide substantive services for its citizens. In *Black v. Beame,* 419 F.Supp. 599 (S.D.N.Y.1976), *aff'd,* 550 F.2d 815 (2d Cir.1977), the Court emphasized the distinction between a family's right to be free from state intrusion and the state's purported obligation to provide services geared toward family unity:

> There is no constitutional obligation on the state either to provide plaintiffs with welfare or housing benefits or to affirmatively insure a given type of family life, and none may be created by inference and misdirection through the penumbral constitutional family right to familial privacy. Though this Court has the power to insure that no state agency improperly *interfere* in Black's family life, it does not have the power to enforce the laudable sociological view of the importance of the family held by plaintiffs and their next friends.

*Id.* at 607 (citation omitted) (emphasis in original).[5]

Thus, plaintiffs' claims to parental and sibling visitation, stable placements in the least restrictive setting possible, and adequate caseworkers are not cognizable under the substantive due process reach of

---

**4.** Plaintiffs here do not argue that the state violated their rights to family association when the state initially removed them from their natural parents. In their amended complaint, plaintiffs allege that the state is dilatory in reacting to reports of abuse and neglect, but nowhere do they seek to base a claim on this allegation. Nor do they argue that a state has breached an affirmative Fourteenth Amendment duty to remove children from the custody of their natural parents when the state is deliberately indifferent to the likelihood that the children are being abused or neglected. Such a claim would run afoul of the Supreme Court's recent decision in *DeShaney,* where the Court held that, because the state is under no obligation to provide substantive services, it is not obliged to remove a child from the custody of its natural parents, even where it suspects that the child is being abused.

**5.** Plaintiffs' attempt to distinguish *Black* is unavailing. In *Black,* the plaintiffs were nine sib-

lings, five of whom lived with their mother and four of whom were placed by the state in foster care. The court rejected the argument that the state was under a duty to allocate resources to unite the children in foster care with other members of their family. Plaintiffs argue that *Black* is inapplicable to their cases because the state has already interfered with the family bond by removing them from their natural parents. However, as noted, nowhere in their complaint do plaintiffs allege that the state has improperly removed children in their care from their natural parents. In *Black,* the court noted that it would intervene only if the state *improperly* interfered in family life. Indeed, even if the state had improperly interfered in the sanctity of plaintiffs' family life in this case, the appropriate remedy might simply be to order return of the children to their natural parents, a solution that would involve little expenditure of state resources.

the Fourteenth Amendment, because the Fourteenth Amendment does not mandate an optimal level of care and treatment. *See Society for Good Will,* 737 F.2d at 1250. *See also Hanson v. Clarke County,* 867 F.2d 1115, 1120 (8th Cir.1989) ("*Youngberg* recognizes a right to 'minimally adequate training,' not optimal training"). The courts have consistently refused to recognize the constitutional rights advocated by plaintiffs. *See Black,* 419 F.Supp. at 607 (no right to services that would promote a permanent family home); *Bell v. Milwaukee,* 746 F.2d 1205, 1246 (7th Cir. 1984) (no sibling association rights); *Society for Good Will,* 737 F.2d at 1249 (no absolute constitutional right to access to least restrictive setting in state foster care program).

Defendant mounts two further attacks on plaintiffs' constitutional claims. First, defendant argues that Count I is deficient in its entirety because it fails to properly plead that defendant intentionally deprived plaintiffs of any constitutional rights. Under § 1983, plaintiffs must first allege, as they have done, that defendant violated their federal constitutional or statutory rights. The second inquiry under § 1983 is whether "the conduct complained of was committed by a person acting under color of state law." *Parratt,* 451 U.S. at 535, 101 S.Ct. at 1913.

■ Plaintiffs are suing Johnson in his official capacity only. A suit against a government official acting in his official capacity is only "another way of pleading an action against an entity of which the officer is an agent." *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611. To state a claim under § 1983 against a government entity, plaintiffs must allege sufficient facts to suggest that the unconstitutional and illegal acts of Johnson were done pursuant to a govern-

mental custom or policy. *Id.* at 690–91, 98 S.Ct. at 2035–36. To establish a governmental custom or policy, the plaintiffs must allege facts which indicate problems which are "systemic in nature" such that knowledge of or deliberate indifference to their occurrence can be imputed to the governmental entity. *Powe v. City of Chicago,* 664 F.2d 639, 651 (7th Cir.1981); *see also City of Canton v. Harris,* — U.S. —, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (a showing of "deliberate indifference" is required to sustain a § 1983 action against a governmental entity). We read the complaint to allege that defendant committed the acts complained of with deliberate indifference to plaintiffs' rights and did so pursuant to an official policy or custom. This satisfies the requirements of § 1983.

■ Second, defendant argues that our recognition of substantive due process rights would amount to federal court intrusion into the economics of state government. Defendant asserts that it is exclusively within the realm of state government to decide how to allocate its resources. This argument is unsound. Concern with the availability of resources is rarely part of the constitutional decision-making process where a recognized constitutional right is violated.[6] *Thomas S. Brooks v. Morrow,* 601 F.Supp. 1055 (W.D. N.C.1984). In *Brooks,* the court was unsympathetic to the state's argument that it had placed a mentally retarded child in the best facilities available. The court held that the plaintiff was entitled to the placement which professionals determined was appropriate for him and did not have to settle for one simply because it was available. The court stated:

Lack of funding or of established alternatives is not a factor which may be considered in determining the scope of this constitutional right [to professionally prescribed treatment].... To the extent

---

**6.** We point out that, in dismissing some of plaintiffs' claims, we have already drawn a line between the state's interest in allocating its resources and plaintiffs' individual constitutional rights. In employing the yardstick "professional judgment" as the measure of plaintiffs' rights, we do not mean to reopen the door to claims

already dismissed, such as plaintiffs' claims to placement in the "least restrictive setting" and "sibling visitation" rights. Such claims are not cognizable under the Fourteenth Amendment, and thus the state does not depart from professional judgment in failing to provide for them.

that a professional's judgment of the appropriate treatment is shown to have been modified to fit what is available, that judgment likely has become a "substantial departure from accepted professional judgment, practice, or standards." *Id.* at 1059–60 (quoting *Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462).[7]

Equal Protection

■ Equal protection is violated in the constitutional sense when a state is shown to have purposefully discriminated against those entitled to be treated in the same manner as others similarly situated. *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944). "[A] discriminatory purpose is not presumed; there must be a showing of 'clear and intentional discrimination.'" *Id.* (quoting *Gundling v. Chicago,* 177 U.S. 183, 186, 20 S.Ct. 633, 635, 44 L.Ed. 725) (1900) (citation omitted). Plaintiffs allege that "[t]he children in DCFS' custody fall into two classes: those who receive services and those who do not." Plaintiffs' Memorandum In Response to Defendant's Motion to Dismiss at p. 46. So framed, plaintiffs fail to state a claim for equal protection. The courts have consistently rejected similar equal protection arguments in the past. For example, in *Huggins v. Isenbarger,* 798 F.2d 203 (7th Cir.1986), the court rejected a prison inmate's assertion that, under the Equal Protection Clause, prisoners who received parole constituted a separate class from those who did not, reasoning that such a distinction "is a truism rather than a legal objection." *Id.* at 206. To allow an equal protection claim each time a person does not receive statutory entitlements would effectively make the Equal Protection Clause an avenue of recovery in every case where the state is doling out statutory benefits.

Procedural Due Process

■ Plaintiffs assert that defendant has deprived them of services to which they have a statutory entitlement without due process of law. Specifically, plaintiffs seek to establish a constitutionally protected liberty and property interest in § 2 of the Abuse and Neglected Child Reporting Act ("ANCRA"), Ill.Rev.Stat. ch. 23, ¶ 2052, §§ 5 and 6a of the Act Creating the Department of Children and Family Services ("Act Creating DCFS"), Ill.Rev.Stat. ch. 23, ¶¶ 5005 and 5006a, and § 1–2(3)(b) of the Juvenile Court Act, Ill.Rev.Stat. ch. 37, ¶ 801–2(3)(b). In determining whether plaintiffs have a constitutionally protected liberty or property interest in the benefits of these sections, the proper focus of inquiry is whether plaintiffs have a "legitimate claim of entitlement to those benefits." *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The Court in *Roth* explained:

> To have a property interest in a benefit a person clearly must have more than an abstract need or desire for it.... He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

*Id.* at 577, 92 S.Ct. at 2709.

Plaintiffs' procedural due process claims suffer from at least one fatal infirmity. They have failed to point to standards in the statutory provisions they cite by which a due process hearing can determine what services are available or appropriate under the circumstances. The Seventh Circuit, in *Eidson v. Pierce,* 745 F.2d 453, 459–60 (7th Cir.1984), held that "a legitimate claim of entitlement is created only when the statutes or regulations in question establish a framework of factual conditions delimiting entitlements which are capable of being explored at a due process hearing." *See*

---

**7.** Budgetary considerations are implicated in an action for damages against a professional in his individual capacity. A "professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good faith immunity would bar liability." *Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462. As noted, plaintiffs are suing defendant in his official capacity only.

*also Farmer v. Lane,* 864 F.2d 473 (7th Cir.1988) (same). Section 2 of ANCRA requires DCFS to provide a wide range of services to "stabilize the home environment, preserve family life whenever possible and protect the health and safety of children." Sections 5 and 6a of the Act creating DCFS are equally imprecise. The terms "care and training," "family preservation services," and "appropriate services" provide little guidance as to what services are to be provided to which families and children. Similarly, § 1–2(3)(b) of the Juvenile Court Act, which confers rights on a child to "services necessary to his or her proper development, including health, education and social services" is incapable of precise definition. Plaintiffs' argument that the mandatory language contained in these sections creates a constitutionally protected liberty or property right is unfounded. In *Hewitt v. Helms,* 459 U.S. 460, 471–72, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983), the Supreme Court held that for state statutory language to create a legitimate claim of entitlement, mandatory language must be combined with "specific substantive predicates." Thus, under *Hewitt,* an entitlement is created only where the occurrence of a specific predicate event triggers provision of specific services. As noted above, the cited provisions do not contain the "specific substantive predicates" required by *Hewitt.* Indeed, plaintiffs concede as much when they agree that, while the mandatory language gives DCFS no discretion as to *whether* to provide services, the broad statutory language grants DCFS discretion about *what* particular services to provide. Plaintiffs' Response to Defendant's Motion to Dismiss at p. 45. This is insufficient to establish a liberty or property right under *Hewitt.*

### Count II: Adoption Assistance and Child Welfare Act

The Adoption Assistance and Child Welfare Act ("AAA") is incorporated in Title IV, Parts B and E, of the Social Security Act, 42 U.S.C. §§ 620–28, 670–76 (1982). Plaintiffs allege that the State of Illinois receives sufficient federal funds to be bound by the provisions of the AAA, and that DCFS is the agency designated to use and distribute those funds. Complaint at ¶ 23. Plaintiffs allege that they have a right of action under 42 U.S.C. § 1983 and the AAA to seek an injunction to enforce the provisions of the AAA.

### Section 1983

In *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Supreme Court held that § 1983 is available to redress violations of federal statutes by state agents. In *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), and *Middlesex County Sewerage Auth. v. National Sea Clammers Assn.,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the Supreme Court articulated two exceptions to the application of § 1983 to remedy federal statutory violations: where the statute does not create enforceable "rights, privileges or immunities" within the meaning of § 1983 and where Congress has foreclosed such enforcement of the statute in the enactment itself.

The burden is on plaintiffs to prove that the statute creates enforceable rights. *Vantage Healthcare Corp. v. Virginia Bd. of Medical Assistance Services,* 684 F.Supp. 1329, 1331 (E.D.Va.1988). To assert a substantive right under a statute, plaintiffs must demonstrate that Congress intended to create the right as a condition for federal funding:

> [L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.

*Pennhurst,* 451 U.S. at 17, 101 S.Ct. at 1540 (citations omitted).

Plaintiffs argue that the provisions of Title IV–B and Title IV–E impose duties on the state and bestow corollary rights on plaintiffs. Title IV–B authorizes the Secretary of Health and Human Services ("Secretary") to appropriate money to be used by the states in providing a variety of services. These include services to prevent or remedy "neglect, abuse, exploitation or delinquency of children," § 625(a)(1), services geared to family unity or reunifying separated children with their natural parents or adequate care of children away from their families in circumstances where return of the child to his or her natural parents is not possible, § 625(a)(1)(E) and (a)(1)(F), and periodic investigation into current foster placements. § 627. Plaintiff's Response to Defendant's Motion to Dismiss at pp. 7–8.

In our view, Congress intended Title IV–B to be an expression of goals and guiding principles rather than an enactment that creates enforceable federal rights. Title IV–B was expressly enacted "[f]or the purpose of enabling the United States, through the Secretary, to cooperate with state public welfare agencies in establishing, extending and strengthening child welfare services...." 42 U.S.C. § 620(a). In reviewing similar language in *Pennhurst*, where plaintiffs claimed rights under standards set forth in the Developmentally Disabled Assistance and Bill of Rights Act ("DDA"), 42 U.S.C. § 6000 *et seq.*, the Supreme Court stated:

> [T]he Act's language and structure demonstrate that it is a mere federal-state funding statute. The explicit purposes of the Act are simply "to assist" the States through the use of federal grants to improve the care and treatment of the mentally retarded.... Nothing in either the "overall" or "specific" purposes of the Act reveals an intent to require the States to fund new, substantive rights.

*Pennhurst*, 451 U.S. at 18, 101 S.Ct. at 1540. Nothing in Title IV–B can be said to intend the creation of the kind of rights to which a remedy in favor of persons such as plaintiffs could attach. Indeed, § 625, relied on by plaintiffs as creating enforceable rights, is the definitional section of Title IV–B. Section 625 defines "child welfare services" to mean "public social services which are directed toward the accomplishment of the ... purposes" listed by plaintiffs. It would be strange for Congress to create enforceable rights in the definitional section of a statute.

With respect to the AAA provisions of Title IV–E of the Social Security Act, we do not believe Congress intended to create an enforceable individual right of placement in the least restrictive (most family-like) setting or of "reasonable efforts" to eliminate the necessity of removing the child from the home or to return a child home. Plaintiffs' reliance on *Lynch v. Dukakis*, 719 F.2d 504 (1st Cir.1983), *L.J. By And Through Darr v. Massinga*, 838 F.2d 118 (4th Cir.1988), and *Joseph A. By Wolfe v. N.M. Dept. of Human Services*, 575 F.Supp. 346 (D.N.M.1982), as recognizing these rights is misplaced. In each of these cases the court merely held that children in state foster care could maintain a § 1983 action for prospective injunctive relief where it was alleged that the state had not complied with the statutorily mandated procedure of developing and periodically reviewing case plans for the children under its supervision. Nowhere did these courts recognize an entitlement to placement in the least restrictive setting or reasonable efforts by the state to maintain a stable home environment. In reviewing similar language in *Pennhurst*, the Supreme Court remarked that "[i]t is difficult to know what is meant by 'appropriate treatment' in the 'least restrictive setting,' and it is unlikely that a State would have accepted federal funds had it known that it would be bound to provide such treatment." *Pennhurst*, 451 U.S. at 24–25, 101 S.Ct. at 1543–44. *See also Hunt v. Robeson County Dept. of Social Services*, 816 F.2d 150, 153 (4th Cir.1987) (section in statute requiring states to reserve from the funds allocated to them " 'a reasonable amount ... for energy crisis intervention' " does not create individual rights enforceable via § 1983).

Plaintiffs also assert that, under the AAA, siblings have a right to be placed

together. However, no such requirement is explicitly mentioned in the AAA. Even if it were, such a claim would suffer from the same infirmities as plaintiffs' "reasonable efforts" claim or their "least restrictive setting" claim. A similar claim was raised and rejected in *Scrivner v. Andrews*, 816 F.2d 261, 263–64 (6th Cir.1987), where the court held that the AAA does not include an enforceable right to "meaningful visitation" between a parent and child.

■ We do hold, and defendant appears to concede,[8] that the AAA creates an enforceable right to an individualized "case plan" and "case review system." The eligibility of a state to receive an appropriation under the AAA is predicated upon its implementation and operation of "a case review system ... for each child receiving foster care under the supervision of the state." 42 U.S.C. § 627(a)(2)(B). The requirement is repeated and clarified in 42 U.S.C. § 671(a)(16), which requires "a case plan ... for each child receiving foster care maintenance payments ... [and] a case review system ... with respect to each such child." We believe that these provisions impose affirmative obligations on the state and bestow corollary rights on plaintiffs that are private and enforceable under 42 U.S.C. § 1983. Other courts have held that plaintiffs have an enforceable right to a case plan and case review system. *See Lynch, supra; Joseph A. by Wolfe, supra.* We stress, however, that plaintiffs' entitlement to a case review system and an individualized case plan does not give rise to the sweeping rights asserted by plaintiffs, such as the right to an adequate number of case workers, family reunification services, services to "troubled families," or rights of meaningful visitation between siblings. The case review system and individualized case plans are procedures intended only to monitor the progress and well-being of chil-

dren in state and foster care. Beyond the narrow requirements of a case plan and case review system, the AAA does not impose on the state the sweeping duties alleged by plaintiffs. The incremental effect of performing this obligation is not so great as to have a prohibitive effect on the state's choice of whether to participate in the plan or not.

■ Although defendant concedes that plaintiffs may have a substantive right to a case plan and case review system, he argues that Congress has foreclosed the use of § 1983 to enforce these rights. In a § 1983 action, defendant has the burden of demonstrating "by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement. 'We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy' for the deprivation of a federally secured right." *Wright v. Roanoke Redev. & Housing Auth.* 479 U.S. 418, 423–24, 107 S.Ct. 766, 771, 93 L.Ed.2d 781 (1987) (quoting *Smith v. Robinson*, 468 U.S. 992, 1012, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984)).

The Supreme Court has held that, where a statute provides adequate administrative remedies, there is no right to further procedural due process and a § 1983 action is thus precluded. *Hudson v. Palmer*, 468 U.S. 517, 533 n. 14, 104 S.Ct. 3194, 3204 n. 14, 82 L.Ed.2d 393 (1984). The applicable AAA enforcement provisions empower the Secretary to withhold or reduce federal funds if a state plan does not comply with § 671(a) or if the state fails substantially to comply with the state plan. § 671(b). The state may appeal an adverse ruling of the Secretary to any federal court of appeals and eventually seek review by the Supreme Court under a writ of certiorari. 45 C.F.R. § 201.7. Federal regulations provide that an interested person may request to participate in administrative hearings to deter-

---

**8.** Relying on *Scrivner* in his motion to dismiss, defendant argued that there is a split in the circuits on the question of whether the AAA includes an enforceable right to an individualized "case plan" and "case review system." However, in *Scrivner,* the court merely held that the AAA did not provide a right to visitation between parent and child. Indeed, the court explicitly distinguished *Lynch.* In his reply brief, defendant withdrew his opposition to plaintiffs' assertion of a right to an individualized case plan and case review system, and now suggests that plaintiffs may well have such a right.

mine whether a state has substantially complied with federal requirements. 45 C.F.R. § 213.15(b). Further, § 671(a)(12) requires the state plan to provide "for granting an opportunity for a fair hearing before the state agency to any individual whose claim for benefits available pursuant to this part is denied or is not acted upon with reasonable promptness." Finally, the AAA requires the state to assure a dispositional hearing to each child in foster care at least eighteen months after the original placement to determine the future status of the child. § 675(5)(C).

Defendant relies on a line of Supreme Court cases which hold that enforcement procedures under various statutes preclude concomitant § 1983 review of administrative action by federal courts. In *Middlesex County Sewerage*, 453 U.S. at 1, 101 S.Ct. at 2615, the Supreme Court held that the existence of elaborate and comprehensive enforcement mechanisms under the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. § 1251 *et seq.*, and the Maine Protection, Research, and Sanctuaries Act ("MPRSA"), 33 U.S.C. § 1401 *et seq.*, demonstrated that Congress intended to supplant any remedy that would otherwise be available to plaintiffs under § 1983. The FWPCA authorizes the EPA administrator to respond to violations of the Act with compliance orders and civil suits. He may seek to impose criminal and civil penalties. Additionally, " 'any interested person' may seek judicial review in the United States courts of appeal of various particular actions by the Administrator, including establishment of effluent standards and issuance of permits for discharge of pollutants." *Id.* at 13–14, 101 S.Ct. at 2623. Most of these enforcement mechanisms have their counterparts under the MPRSA, and both statutes authorize private persons to sue for injunctions in federal district court to enforce their provisions.

In *Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), also relied upon by defendant, the Court considered whether Congress intended the administrative remedies contained in the Education of the Handicapped Act ("EHA"), 20 U.S.C. § 1400 *et seq.*, to preclude § 1983 enforcement. In concluding that Congress intended the EHA to be the exclusive avenue through which a plaintiff can assert a claim to publicly financed special education, the Court emphasized that individual plaintiffs are granted "fair and adequate" hearings, "detailed procedural safeguards," and "a right to judicial review" in state or federal court. *Id.* at 1011, 104 S.Ct. at 3468.

By contrast, the AAA does not contain a comprehensive system of procedures and guarantees of the kind set out in the EHA, FWPCA and MPRSA. Unlike the FWPCA and MPRSA, it does not provide for private citizen suits directly against the offending officers of the DCFS. Similarly, unlike the EHA, the AAA does not contain a right to judicial review.

In our view, these private enforcement procedures are insufficient to indicate foreclosure under the AAA. In *Wright*, 479 U.S. at 424, 107 S.Ct. at 771, the Court rejected the argument that federal courts are without power to review state welfare provisions simply because Congress has lodged in the Department of Housing and Urban Development the power to cut off funds for substantial non-compliance with statutory requirements. Defendant tries to distinguish *Wright* and similar cases by pointing out that the AAA provides for citizen participation.[9] However, the existence of an administrative remedy does not generally foreclose resort to § 1983. *Patsy v. Florida Board of Regents*, 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982) (based on a review of legislative history of § 1983, the Court concluded that

---

**9.** We disagree with defendant's suggestion that the court in *Wright* based its holding on the narrow ground that the only way to compel state compliance with federal law is for the Secretary to cut off federal funding. Although plaintiffs in *Wright* disputed whether or not they had a right to an administrative hearing under the AAA, the court explicitly noted that administrative remedies do not normally preclude § 1983 action for violation of federally secured rights. Further, the court noted, in passing, that the statute did not provide for class-wide relief of the type being sought in that case.

Congress did not intend administrative remedies to foreclose § 1983 actions.) Further post-deprivation relief is not really responsive to cases such as this one, where a class alleges malfeasance. Such problems are treated inefficiently if they must be pursued individually. *See Wright,* 479 U.S. at 427, 107 S.Ct. at 772. Defendant's argument that the AAA provides dispositional hearings under § 675(5)(C) does not solve the problem. Such dispositional hearing is confined to children who have been placed in foster care and does not apply to children who are under direct supervision of the state. Further, the state is required to hold the dispositional hearing pursuant to the case review system which plaintiffs allege they are not being afforded.

Our conclusion is also supported by case law from other circuits. Every court to consider this exact issue has concluded that children, such as plaintiffs, are entitled to enforce their rights to a case review system and case plan through a § 1983 action. *See Lynch,* 719 F.2d at 513; *L.J. By and Through Darr v. Massinga,* 838 F.2d 118 (4th Cir.1988); *Joseph A. By Wolfe,* 575 F.Supp. at 353. Indeed, in *Lynch* the court noted that the provisions of the Social Security Act have "a legacy of private enforcement." *Lynch,* 719 F.2d at 512. Defendant's reliance on *Scrivner,* 816 F.2d at 263, and *Harpole v. Arkansas Dept. of Human Services,* 820 F.2d 923 (8th Cir. 1987), is misguided. In *Scrivner,* the court dismissed claims improperly brought under the AAA and § 1983. *Scrivner* is distinguishable from our case because plaintiffs' claim in *Scrivner* was not predicated upon the right to an individualized case plan and case review but, rather, upon a claimed right to "meaningful visitation" allegedly secured by the AAA. The court made it clear that it did not disagree with the holding in *Lynch:*

> Implicit in the *Lynch* decision was the understanding that the Adoption Assistance Act bestowed upon children under state supervised foster care the right to an individualized case plan and a system for case review and that those children and the members of their natural and foster families were free to pursue a

§ 1983 action which sought to enjoin the state to comply with its mandated system for case review.

*Scrivner,* 816 F.2d at 263.

*Harpole* is equally distinguishable. In *Harpole,* the court dismissed a grandmother's wrongful death claim against the state for loss of a child that had been returned to its neglectful mother. The court found that, under the circumstances, the AAA does not provide a cause of action. In so holding, the court noted that the child was not in the state's custody when the injury occurred.

### Implied Right of Action

█ We also find an implied right of action under the terms of the AAA. In *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court announced four relevant factors in determining whether to infer a cause of action from a federal statute:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted? ... Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2088 (citations omitted) (emphasis in original). The Supreme Court has noted that the central inquiry is whether Congress intended, either expressly or by implication, to create a private cause of action. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 2488, 61 L.Ed.2d 82 (1979).

Thus, the analysis is similar to whether Congress intended to preclude § 1983 actions. *See Wright,* 479 U.S. at 432–33, 107 S.Ct. at 775–80 (O'Connor, J., dissenting) (applying *Cort* analysis in determining whether enforceable rights existed within the meaning of § 1983). *See also Polchow-*

*ski v. Gorris,* 714 F.2d 749, 751 (7th Cir. 1983) (the inquiry under § 1983 resembles the analysis used to determine whether a private cause of action may be implied from an enactment of Congress).[10] Therefore, we hold that plaintiffs have an implied right of action under the AAA, as well as an action under § 1983, to enforce their rights to a case review system and individualized case plans.

CONCLUSION

We grant defendant's motion in part. The plaintiffs have stated the following valid claims: (1) a Fourteenth Amendment substantive due process claim to be free from arbitrary intrusions upon their physical and emotional well-being while directly or indirectly in state custody, and to be provided with adequate food, shelter, clothing, medical care, and minimally adequate training to secure these basic constitutional rights. (2) Plaintiffs have a right of action under 42 U.S.C. § 1983 and the Adoption Assistance and Child Welfare Act, 42 U.S.C. §§ 620–28, 670–76, to require defendant to provide a case review system and individualized case plans.

We dismiss the following claims: (1) plaintiffs' equal protection claims; (2) plaintiffs' due process claims for violation of state statutory provisions; and (3) plaintiffs' remaining substantive due process claims, such as their claims to rights of placement in the least restrictive setting and sibling visitation. We restrict plaintiffs' enforceable claims under the AAA to those specified above.

---

**10.** Insofar as we are aware, no case has yet permitted a § 1983 suit to enforce federal statutory rights, while refusing to recognize an implied right of action under the statute. Moreover, courts generally eschew a meaningful analysis of the relationship between § 1983 and implied rights of action, preferring instead to analyze each separately.